Kirk Edward OTIS *v.* STATE of Arkansas

CR 03-334 142 S.W.3d 615

Supreme Court of Arkansas
Opinion delivered January 22, 2004

*Elizabeth S. Johnston* and *Dorcy K. Corbin*, Arkasas Public Defender Commission, for appellant.

*Mike Beebe*, Att'y Gen., by: *Linda Blackburn*, Ass't Att'y Gen., for appellee.

JIM HANNAH, Justice. Appellant Kirk Otis appeals the order of the Arkansas County Circuit Court denying his motion to transfer his case to juvenile court pursuant to Ark. Code Ann. § 9-27-318 (Repl. 2002). He argues that the trial court's decision to try him as an adult is clearly erroneous in that the decision is not supported by clear and convincing evidence. He also argues that § 9-27-318 is unconstitutional in that the application of the statute violated his fundamental due process rights and equal protection rights under both the United States Constitution and the Arkansas Constitution.[1] We hold that the trial court was not clearly erroneous in determining that there was clear and convincing evidence to try Otis as an adult. We also hold that the application of § 9-27-318 did not violate Otis's fundamental due process rights and equal protection rights.

## Facts

On July 27, 2001, Otis was charged by felony information in Arkansas County Circuit Court with the offense of capital murder. The information alleged that on July 20, 2001, Otis robbed, shot, and killed Barney Smith while Smith sat on the steps of his front porch. At the time of the murder, Otis was fourteen-years-old.

Otis filed a motion to have his case transferred to juvenile court. In addition, Otis filed a pretrial motion, in which he argued that § 9-27-318 was unconstitutional, and on July 29, 2002, a hearing commenced on both motions before the trial court.

At the hearing, Otis first presented testimony from his paternal grandmother Catherine Geans. Geans testified that Otis's parents were both fourteen-years-old when Otis was born. She

---

[1] Aside from citing article 2, §§ 3 and 8 of the Arkansas Constitution, Otis offers no citation to authority or support for his argument that § 9-27-318 violates his due process rights and equal protection rights under the Arkansas Constitution. This court does not consider arguments that are unsupported by convincing argument or sufficient citation to legal authority. *See Kelly v. State*, 350 Ark. 238, 85 S.W.3d 893 (2002).

stated that Otis had been living with her ever since he started kindergarten, and that prior to living with her, Otis lived with his maternal grandmother. Geans stated that Otis is easily persuaded and manipulated by his friends. She stated that Otis did not finish the seventh grade because he was suspended from school for fighting. She stated that when Otis was fourteen-years-old, his curfew was ten o'clock. However, she testified that Otis did not always come in at ten o'clock, and that when he did not, she did not go and look for him.

Geans testified that the Department of Human Services became involved with the family when Otis's father whipped him and left a mark on his back. She testified that due to his behavioral problems, Otis had previously been admitted to both Pinnacle Point and Bridgeway, where he was placed on Ritalin, as well as other medication. Geans stated that when Otis was arrested, he was no longer on medication. She stated that she stopped giving the medication to Otis because "[i]t didn't seem to be helping him any."

Geans also testified about Otis's relationship with her husband and Otis's grandfather Edward Geans. She stated that, after Edward had been drinking, he would aggravate Otis. She also stated that Edward had whipped Otis with a belt.

Geans stated that she thought Otis was immature. In explaining Otis's level of maturity, she stated that, at the time he was arrested, Otis mostly watched the Cartoon Network, and that his favorite shows were *Pokemon* and *Dragon Ball-Z*.

Treda Rice-Vance, a DHS supervisor, stated that she opened a file on Otis after DHS received a physical abuse report against Otis's father. According to Otis, his father came over to his grandparents' house and whipped him with an extension cord. Rice-Vance stated that Otis's father told her he had hit Otis with a piece of rubber. Rice-Vance stated that she never saw the item that Otis was whipped with, but whatever it was, it left marks on Otis. Rice-Vance stated that Otis's father told her he disciplined Otis because he wanted Otis to be respectful to his grandparents. She also stated that Otis's father told her he could not keep Otis because he was living in Pine Bluff with another lady and her children. Rice-Vance stated that it was her understanding that Otis was living with his paternal grandparents because his mother was allegedly abusing drugs and unable to care for Otis. Rice-Vance stated that after she opened a file on Otis, she visited the home at

least once a week. She stated that DHS eventually closed the file because Otis was doing better and his grandmother was not having any problems with him.

Fonda Scherm testified that she became familiar with Otis when she was a social worker at the Stuttgart Public Schools. Scherm could not remember what grade Otis was in when she became involved with him, but she stated that Otis was young, and in either the first, second, or third grade. She stated that Otis got into trouble quite a bit, and that if the school sent him home for disciplinary reasons, she would often take Otis home if his grandmother could not leave work to come and pick him up. Scherm also testified that she paid visits to Otis's home when he missed several days of school or when Otis was misbehaving at school. She stated that she visited Otis's home when he had been suspended from school and his family members failed to make appointments to get Otis readmitted to school. She explained that before a child can be readmitted to school after a suspension, a parent must come to school with the child and discuss the suspension with school administrators.

Scherm also testified that in 1995 or 1996, Otis fixed breakfast for his grandfather one morning and put something, such as Clorox, in his grandfather's eggs. Scherm stated that, as a result of this incident, a Family In Need of Services ("FINS") petition was filed, and Otis was placed in either Bridgeway or Pinnacle Point.

Scherm stated that she saw Otis shortly after he was arrested on the present charge. She stated that he asked her what was going to happen to him, and that he wanted to know if he was going to Alexander or C-Step. She stated that Otis did not "have a concept that it was that — bigger than that." She stated that she did not consider Otis to be a mature fourteen-year-old and that in her experience with Otis, she did not believe that Otis had ever lived in a structured environment.

Otis next presented testimony from Melanie McCord Bradberry, Otis's classroom teacher at the Juvenile Detention Center in Arkansas County. She stated that Otis was on the fifth grade to seventh grade level, depending on the subject area. She stated that when Otis first arrived at the center, she did not see in Otis a great desire for achievement. However, she stated that since Otis has been in her classroom, he has seen that he can achieve, and that the more he achieves, the more he wants to achieve. She stated that,

after she administers tests, Otis is interested in seeing his test results and that most of the time, Otis is enthusiastic about learning. She stated that the worst behavior problem she had experienced with Otis was that on occasion, Otis had used foul language. Bradberry stated that, in her opinion, Otis had made progress because the program at the center was structured. She also stated that she had never seen Otis exhibit any aggressive behavior.

Otis also presented testimony from Robert J. McCracken, the facility director at Cornell Alexander Youth Services Center. McCracken testified about JUMP, a program for serious offenders. He explained that JUMP was a program with a highly structured environment, where activities are scheduled for the children from the time they wake up at six-thirty in the morning until the time they go to bed at nine o'clock in the evening. He also stated that children in JUMP participated in individual counseling each week and family therapy, if appropriate. In addition, McCracken stated that children in the program participated in two group therapy sessions each day. He testified that in group therapy, the children discussed issues such as anger management, substance abuse, and cognitive restructuring. McCracken stated that presently there were convicted murderers in the program.

McCracken testified that if Otis were convicted as a juvenile, he would most likely go to JUMP. He stated that the JUMP program's philosophy was that people can change, and that JUMP, with its ratio of six clients per staff member, as opposed to an adult prison, with a ratio of fifty or sixty inmates per corrections officer, was conducive to helping offenders change. On cross-examination, McCracken was unable to provide any data concerning the success rate of the program.

Dr. Phillip Derdeyn, a child and adolescent psychiatrist, testified about Otis's prior hospitalizations. He stated that Otis was admitted to Pinnacle Point after he put some rubbing alcohol in his grandfather's meal. He stated that Otis told him that he did this because he was mad at his grandfather for hitting him in the eye with a firecracker. Dr. Derdeyn stated that, while at Pinnacle Point, Otis was diagnosed with Oppositional Defiant Disorder and placed on Mellaril, a tranquilizer. He also stated that Otis was diagnosed as having borderline intellectual functioning.

Dr. Derdeyn stated that Otis was admitted to Bridgeway after he was "[g]etting angry at school, kicking desks, shouting obscenities at the teacher and principal, [and] making suicidal

statements." Dr. Derdeyn also stated that, at that time, Otis expressed a desire to live in a foster home. He stated that during his stay at Bridgeway, Otis was treated with Tegratol.

Dr. Derdeyn stated that several months after leaving Bridgeway, Otis was admitted to Meridell, a treatment facility in Austin, Texas. While at Meridell, Otis was treated with Tegratol. Dr. Derdeyn stated that Otis's most recent I.Q. score was 68, and that a person with such an I.Q. had diminished reading comprehension and delayed development of judgment.

Harold Jackson, a case manager at the Arkansas Division of Youth Services, testified about the JUMP program. He stated that JUMP houses convicted murderers "all the time." Jackson stated that in his opinion, the biggest problem with sending a fifteen or sixteen-year-old directly to prison would be a concern for the juvenile's safety.

Joseph Cummings, an investigator for the Arkansas Public Defender Commission and a mental health associate at Rivendale Behavioral Hospital, testified next. He stated that he had met with Otis on ten different occasions. Cummings testified that Otis has childlike interests, and that he does not seem to be very mature for his age. Cummings stated that Otis relates time to what time cartoons come on television. He stated that if he asked Otis what time something happened, Otis could not tell him a specific time. Instead, according to Cummings, Otis would state: "Well, Dragon Ball-Z was on, so that was probably around four o'clock." He stated that Otis has a very short attention span, and that he did not believe Otis understood the serious nature of the charges against him. Cummings testified that he asked Otis what he thought about prison, and Otis "kind of described it like a day-camp." He testified that Otis described prison as a place where "you lift weights, eat, play basketball, uh, they have workshops." Cummings stated that Otis was not aware of the fact that he could be victimized while in prison.

Following testimony from Otis's witnesses, the State presented testimony from Special Agent R.L. Newton of the Arkansas State Police. Newton testified that Otis had been charged with capital murder in connection with the death of Barney Smith. He stated that the medical examiner's report indicated that Smith was killed by one gunshot wound to the upper part of the right chest. Newton also stated that Smith was robbed in connection with the shooting.

Newton stated that, in his statement to police, Otis stated that he borrowed the gun from Sammy Washington. Newton testified that Otis stated that he committed the crime due to a remark made by the victim. In addition, Newton stated that, in another statement to police, Otis stated: "I did it. I was drunk. I needed money." Newton stated that his investigation had not revealed that Otis acted in connection with others. Newton referred to the incident as a "random robbery." He stated that the purpose of the robbery, according to Otis, was to "hit a lick." On cross-examination, Newton stated that Otis had also told him that "Lloyd O'Neal did it." In addition, Newton stated that there was no physical evidence connecting Otis to the crime, and he stated that a gun had not been recovered.

Next, the State presented testimony from Dr. William Cochran. Dr. Cochran stated that he performed evaluations on a contract basis for the Southeast Arkansas Behavioral Healthcare. Dr. Cochran stated that he evaluated Otis and found Otis competent to stand trial. He also stated that Otis understood the criminality of his conduct. He stated that Otis's sophistication regarding the legal system, while not perfect, matched or exceeded many adult defendants he had evaluated. Dr. Cochran stated that Otis demonstrated his ability to learn about plea bargaining, based upon conversations Otis had with his podmates. He stated that Otis "was able to take information that he had gotten from social interaction and . . . make inferences from that, and apply that to other issues." This, according to Dr. Cochran, demonstrated "a certain amount of maturation."

Dr. Cochran testified that, since he had not researched any of the rehabilitation facilities, he was unaware of a specific facility that would likely rehabilitate Otis. He stated that he thought the trial court "would want to know something about [the] track record of that facility," and that he would be concerned if DYS had no tracking information other than a six-month aftercare program of people released from DYS.

On cross-examination, Dr. Cochran stated that he only evaluated Otis with regard to his competency to stand trial and his culpability at the time of the alleged offense. He further stated that normally, he did not conduct forensic evaluations.

On August 29, 2002, the trial court entered an order denying Otis's motion to declare § 9-27-318 unconstitutional. On September 5, 2002, the trial court entered an order denying Otis's

motion to transfer to juvenile court. The order included the following findings and conclusions of law:

1. Capital murder is in and of itself a very serious offense, if not the most serious.

2. The evidence so far before the Court is that the offense was committed aggressively, violently, premeditated, and willfully.

3. The offense is against a person.

4. The evidence so far before the Court indicates that the Defendant acted alone in the commission of robbery and murder.

5. The previous juvenile history of the Defendant is not of such a nature as to affect the Court's decision either way.

6. The Defendant's lack of sophistication, maturity, environment, intelligence, or pattern of life may be mitigating factors but are not of such a nature as to cause the Court to believe that the case should be transferred to Juvenile Court. Similarly, the facilities and programs that are available in Juvenile Court are, in the Court's opinion, not likely to rehabilitate the Defendant.

7. The evidence presented by Dr. Cochran strongly indicated that the Defendant is capable of understanding right from wrong.

8. The Defendant's demeanor while in court indicates an understanding of the criminal justice process.

### Clear and Convincing Evidence

Otis argues that the trial court's decision to retain jurisdiction is clearly erroneous because the State failed to prove, by clear and convincing evidence, that he should be tried as an adult.[2]

---

[2] In the case at bar, both Otis and the State agree that the State has the burden to prove, by clear and convincing evidence, that Otis should be tried as an adult. We first considered this issue in *Walker v. State*, 304 Ark. 393, 803 S.W.2d 502 (1991), 805 S.W.2d 80 (1991), *reh'g denied*, 304 Ark. 402-A, 805 S.W.2d 80 (1991). In that case, after noting that the juvenile-transfer statute was silent on which party has the burden of proof, we held that the party seeking to transfer a defendant from one jurisdiction to another has the burden of justifying that transfer by proof and persuasion. *Walker*, 304 Ark. 393, 398. Though we have reaffirmed

Arkansas Code Annotated § 9-27-318(c)(2)(A) (Repl. 2002) provides that when a case involves a juvenile who is fourteen or fifteen-years-old when he engages in conduct that, if committed by an adult, would be capital murder, the criminal division of circuit court and the juvenile division of circuit court have concurrent jurisdiction, and a prosecuting attorney may charge the juvenile in either division. Upon the motion of the court or of any party, the judge of the division of circuit court in which criminal charges have been filed shall conduct a hearing to determine whether to retain jurisdiction or to transfer the case to another division of the circuit court having jurisdiction. Ark. Code Ann. § 9-27-318(e) (Repl. 2002). Upon a finding by clear and convincing evidence that a juvenile should be tried as an adult, the judge shall enter an order to that effect. Ark. Code Ann. § 9-27-318(h) (Repl. 2002).

Clear and convincing evidence is that degree of proof that will produce in the trier of fact a firm conviction as to the allegation sought to be established. *McClure v. State*, 328 Ark. 35, 942 S.W.2d 243 (1997). We will not reverse a trial court's determination of whether to transfer a case to juvenile court unless that decision is clearly erroneous. *Beulah v. State*, 344 Ark. 528, 42 S.W.3d 461 (2001).

In making the decision to retain jurisdiction or to transfer the case, the judge of the division of circuit court must consider all of the following factors:

(1) The seriousness of the alleged offense and whether the protection of society requires prosecution as an extended juvenile jurisdiction offender or in the criminal division of the circuit court;

---

this holding in subsequent cases, *see, e.g., McClure v. State*, 328 Ark. 35, 942 S.W.2d 243 (1997); *Ring v. State*, 320 Ark. 128, 894 S.W.2d 944 (1995); *Williams v. State*, 313 Ark. 451, 856 S.W.2d 4 (1993); *Pennington v. State*, 305 Ark. 312, 807 S.W.2d 660 (1991), we are aware that the issue of whether the juvenile or prosecutor has the burden of proof in juvenile-transfer cases has been called into question in concurring and dissenting opinions by justices of this court. *See Heagerty v. State*, 335 Ark. 520, 524 n.1, 983 S.W.2d 908 (1998) (citing *Thompson v. State*, 330 Ark. 746, 958 S.W.2d 1 (1997)).

Neither the State nor Otis raised this issue below or in their briefs to this court. Therefore, we need not address this issue on appeal. *See Thompson, supra.*

(2) Whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner;

(3) Whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted;

(4) The culpability of the juvenile, including the level of planning and participation in the alleged offense;

(5) The previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;

(6) The sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult;

(7) Whether there are facilities or programs available to the judge of the juvenile division of circuit court which are likely to rehabilitate the juvenile prior to the expiration of the juvenile division of circuit court's jurisdiction;

(8) Whether the juvenile acted alone or was part of a group in the commission of the alleged offense;

(9) Written reports and other materials relating to the juvenile's mental, physical, educational, and social history; and

(10) Any other factors deemed relevant by the judge.

Ark. Code Ann. § 9-27-318(g) (Repl. 2002). In ruling on a motion to transfer to juvenile court, the trial court is required to consider all ten factors; however, the trial court is not required to make a specific finding as to each of the ten enumerated factors. *Beulah, supra.*

### Analysis of Factors

■■ To support his proposition that the trial court was clearly erroneous in determining that he should be tried as an adult, Otis analyzes each of the ten factors set out in § 9-27-318(g).

Specifically, Otis contends that the trial court's order finding that a juvenile should be tried as adult must be supported by clear and convincing evidence of *each* enumerated factor. However, § 9-27-318 does not state that the trial court must find clear and convincing evidence of each factor. Rather, § 9-27-318(h) provides that, after considering *all* of the factors, the trial court must determine whether there is clear and convincing evidence that the juvenile should be tried as an adult. Proof need not be introduced against the juvenile on each statutory factor. *See Ponder v. State*, 330 Ark. 43, 953 S.W.2d 555 (1997). In addition, the trial court is not required to give equal weight to each of the statutory factors. *See Brooks v. State*, 326 Ark. 201, 929 S.W.2d 160 (1996).

Next, we turn to Otis's arguments as they pertain to specific statutory factors. The first factor concerns the seriousness of the alleged offense and whether the protection of society requires prosecution as an adult. In its findings, the trial court stated: "Capital murder is in and of itself a very serious offense, if not the most serious." Otis acknowledges the seriousness of the allegation of capital murder; however, he argues that the trial court cannot rely on the first statutory factor as a basis for its decision because the State produced no evidence that the protection of society demands that he be tried as an adult.

This court has held that a juvenile may be tried as an adult solely because of the serious and violent nature of the offense. *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998); *Thompson v. State*, 330 Ark. 746, 958 S.W.2d 1 (1997); *Ponder, supra*. We have also stated that proof need not be introduced against the juvenile on each statutory factor. *See Ponder, supra*. Since the State was not required to offer proof as to *any part* of the factor, it was certainly not required not to offer proof as to *each part* of the factor. Also, it can be inferred from the serious and violent nature of the offense that the protection of society demands that Otis be tried as an adult.

The second factor concerns whether the alleged offense was committed in an aggressive, violent, premeditated, or willful manner. In this case, there was evidence that Otis was involved in a capital murder, which undoubtedly is a crime of a serious and violent nature. *See Sanford, supra*. However, Otis argues that there was no "substantial" degree of premeditation on Otis's part. This argument is without merit. The second factor does not

refer to a "substantial" degree of premeditation. Moreover, the second factor does not require proof of premeditation; rather, the second factor pertains to whether the alleged offense was committed in an aggressive, violent, premeditated, *or* willful manner.

Otis's next argument pertains to both the second and third statutory factors. The third statutory factor concerns whether the offense was against a person or property, with greater weight being given to offenses against persons, especially if personal injury resulted. In this case, the trial court found that the offense was committed against a person. Otis argues:

> By its very nature, capital murder is an offense committed in an aggressive, violent, premeditated or willful manner against a person. Since that is the charge against Kirk Otis, it is difficult to imagine that any court would fail to find the existence of these two factors where the defendant is charged with capital murder. As a result, the second and third factors should be rendered virtually neutral for the purposes of this case, as they necessarily accompany the charge.

Again, we have made it clear that the trial court is not required to give equal weight to each of the statutory factors. *Brooks, supra.* As such, it is clear that the weight to be afforded to each statutory factor is within the discretion of the trial court.

The fourth factor concerns the culpability of the juvenile, including the level of planning and participation in the alleged offense. Otis again argues that the State failed to prove that Otis acted with a "substantial degree of premeditation." As stated previously with respect to the second factor, the fourth factor does not refer to a "substantial degree of premeditation."

The fifth statutory factor concerns the previous history of the juvenile, including whether the juvenile had been previously adjudicated a juvenile offender, and whether there was any other previous history of antisocial behavior or patterns of physical violence. Otis argues that the trial court was clearly erroneous in determining that his previous history is not of such a nature to affect the court's decision either way. Otis states: "The previous history of the juvenile *should* have affected the Court's decision; the Court *should* have recognized that the State did not put on sufficient proof regarding the factor to establish that 14-year

old Kirk Otis should be tried as an adult." Again, the State is not required to introduce proof on each statutory factor. *See Ponder, supra.*

The sixth factor concerns the sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living, or desire to be treated as an adult. With regard to this factor, the trial court stated that while Otis's lack of sophistication and maturity may be mitigating factors, they are not of such a nature to warrant a transfer to juvenile court. Otis argues that the trial court's finding on this factor reveals that the trial judge erroneously weighed the evidence to determine if there was enough evidence to persuade him to try Otis as an adult. This argument is without merit. We have repeatedly stated that the trial court is not required to give equal weight to each of the statutory factors. *Brooks, supra.* Clearly, we have recognized that the trial court weighs each factor.

The seventh factor concerns whether there are facilities or programs available to the judge of the juvenile division which are likely to rehabilitate the juvenile prior to the expiration of the juvenile division of circuit court's jurisdiction. With regard to this factor, the trial court found that the programs and facilities available to Otis were not likely to rehabilitate him. Otis argues that the State did not put on any evidence regarding this factor which would enable the court to find that Otis should be tried as an adult, and that, based on the evidence presented by Otis, there is clear and convincing evidence that he should be tried as a juvenile. The State was not required to put on proof of each statutory factor. Otis did put on evidence regarding this factor; however, the weight given to evidence regarding this factor was within the discretion of the trial court.

The eighth factor concerns whether the juvenile acted alone or was part of a group in the commission of the alleged offense. The trial court found that, based upon the evidence presented, Otis acted alone. Otis contends that the only evidence offered by the State to show that he acted alone was Otis's conflicting confessions and Newton's testimony concerning one gunshot wound. Otis states: "Certainly, the proof regarding this factor was not enough to support a finding of clear and convincing evidence that Kirk should be tried as an adult." As stated previ-

ously, the trial court's finding on *each* factor need not be supported by clear and convincing evidence. Rather, after considering all ten factors, the trial court must determine whether there is clear and convincing evidence to try the juvenile as an adult.

The ninth factor concerns written reports and other materials relating to the juvenile's mental, physical, educational, and social history. It appears that Otis is arguing that even though there was testimony from both Dr. Cochran and Dr. Derdeyn concerning his history, the trial court did not consider this evidence, but instead considered whether Otis was capable of understanding right from wrong. This ninth factor provides that the trial court is to consider materials relating to the juvenile's mental history. In one of his reports, Dr. Cochran made the determination that Otis was capable of understanding right from wrong. That report is part of Otis's mental history. As to Otis's argument that the trial court did not consider other testimony from Dr. Cochran and Dr. Derdeyn, this court has previously rejected a similar argument. In *Beulah, supra,* the appellant contended that due to the absence of findings relating to some of the enumerated factors, it was clear that the circuit court did not consider those factors. We held that "[t]he circuit court's failure to specifically mention certain evidence presented by the appellant in its order does not mean that the court ignored the evidence or failed to consider it." *Beulah,* 344 Ark. at 535.

The tenth factor is any other factors deemed relevant by the judge. In its order, the trial court stated that Otis's demeanor while in court indicates an understanding of the criminal justice process. Otis appears to argue that this factor should not have been given any weight by the judge because Otis's demeanor in court was due to discussions about the criminal justice system with his teachers, case workers, and attorneys since he had been in custody. The tenth statutory factor provides that the trial judge may consider *any* other factors deemed relevant. This gives extraordinary discretion to the trial judge. Clearly, the trial court deemed Otis's demeanor in court to be a relevant factor in determining whether Otis should be tried as an adult.

In sum, we cannot say, in light of the evidence presented at the hearing, that the trial court's denial of transfer of

Otis's case to juvenile court was clearly erroneous. There is clear and convincing evidence to support the trial court's finding that Otis should be tried as an adult.

### Constitutionality of Ark. Code Ann. § 9-27-318

■ Otis raises several arguments concerning the constitutionality of Ark. Code Ann. § 9-27-318. Statutes are presumed constitutional, and the burden of proving otherwise is on the challenger of the statute. *Reinert v. State*, 348 Ark. 1, 71 S.W.3d 132 (2002). If it is possible to construe a statute as constitutional, we must do so. *Id.*

Otis first argues that § 9-27-318 is unconstitutional because it allows fourteen-year-olds to be sentenced to adult prison, and this constitutes cruel and unusual punishment. To support this argument, Otis cites two secondary sources and states:

> Juveniles housed with adults are five times more likely to be sexually assaulted and 50 percent more likely to be attacked with a weapon than juveniles housed with other juveniles. Additionally, juveniles are twice as likely to be beaten by staff when housed with adults.

■■ The State argues that Otis lacks standing to challenge the constitutionality of the sentencing authorized by § 9-27-318. We agree. In *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977), the United States Supreme Court stated that "the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." Since there has been no formal adjudication of guilt and Otis has not been sentenced, he lacks standing to challenge the constitutionality of the sentencing authorized by § 9-27-318.

Next, Otis argues that his due process rights were violated because "[t]he conclusion reached by the trial court, given the lack of absolute evidence put on by the State, constitutes an arbitrary rubber stamp of the prosecutor's discretion." The State argues that Otis is procedurally barred from raising this argument because he failed to raise it below. As the State points out, Otis's due process argument on appeal is different from the one he made before the trial court. In his brief before the trial court, Otis argued that § 9-27-318 denied him due process because: (1) the statute lowers

the standard for burden of proof from beyond a reasonable doubt to clear and convincing evidence; (2) no statutory guidance is given to the Prosecutor to determine which juveniles to directly charge in adult court, thereby depriving the juvenile of due process of the law prior to a loss of liberty; (3) a juvenile must choose between accepting a charge in adult court or attempting to have his case transferred to juvenile court and put on evidence in a transfer hearing that might not otherwise be brought out, but which can be used in a later proceeding; (4) the statute impermissibly shifts the burden of proof to the juvenile; and (5) the juvenile charged in adult court is, by implication, presumed to be in need of a harsh penalty instead of rehabilitation, being viewed as a child not worthy of rehabilitation.

Indeed, Otis's due process argument on appeal is different from the one he made below. A party cannot change his grounds for an objection or motion on appeal, but is bound by the scope and nature of the arguments made at trial. *Mayes v. State*, 351 Ark. 26, 89 S.W.3d 926 (2002). Since Otis failed to raise this argument below, we decline to address the argument on appeal.

Otis next argues that his Fifth Amendment right against self-incrimination is violated because he was forced to incriminate himself at the transfer hearing. In *Schmerber v. California*, 384 U.S. 757, 761 (1966), the United States Supreme Court stated that the Fifth Amendment privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." The State contends that Otis's argument must fail because nothing in the plain language of the statute required Otis to testify at the hearing and, in fact, Otis did not testify at the hearing. We agree with the State's contention. To the extent that Otis is arguing that he was required to provide, through the testimony of others, evidence which might incriminate him, we note that Otis fails to state how he incriminated himself at the hearing. In addition, we note that Otis does not contend that, for fear of incriminating himself, he declined to provide testimony which might have persuaded the trial court that he should not be tried as an adult, nor did he proffer such testimony before the trial court. Without the proffer, this court has no way of knowing whether such evidence would have been incriminating. *See, e.g., Allen v. State*, 324 Ark. 1, 918 S.W.2d 699 (1996).

 Finally, Otis argues that an impermissible classification exists between juveniles charged with serious offenses and "other juveniles charged with criminal offenses." The equal protection clause permits classifications that have a rational basis and are reasonably related to a legitimate government purpose. *Seagrave v. Price*, 349 Ark. 433, 79 S.W.3d 339 (2002). On an equal protection challenge to a statute, it is not our role to discover the actual basis for the legislation. *Jegley v. Picado*, 349 Ark. 600, 80 S.W.3d 332 (2002). We merely consider whether there is any · rational basis which demonstrates the possibility of a deliberate nexus with state objectives so that legislation is not the product of arbitrary and capricious government purposes. *Id.* If we determine that any rational basis exists, the statute will withstand constitutional challenge. *Id.*

 In *Beck v. State*, 317 Ark. 154, 876 S.W.2d 561 (1994), this court held that the decision of the legislature to vest with the discretion to bring felony charges against sixteen-year-olds is neither arbitrary nor irrational. We stated that the "well-documented rise in the violent crime rate among juveniles in recent years clearly prompted the legislature to make the option of trying sixteen-year-olds as adults available to the state." *Beck*, 317 Ark. at 160. The same rationale is applicable in the present case. The well-documented rise in the violent crime rate among juveniles in recent years prompted the legislature to make the option of trying fourteen and fifteen-year-olds as adults available to the State. In addition, the decision to treat "serious" offenders differently from "non-serious" offenders is neither arbitrary nor irrational. Society demands greater protection from serious offenders, such as those who commit capital murder, than it does from those who commit less serious offenses. Still, Otis argues that society's need to punish juveniles appropriately for serious offenses is protected by Extended Juvenile Jurisdiction ("EJJ"). Otis argues:

> Long before Extended Juvenile Jurisdiction was enacted, the trial court was vested with the authority to retain a juvenile in adult court for trial. Society had determined that 14, 15, or 16 year olds should not be allowed to commit a violent crime then be released to go free upon reaching their 18th birthday. To determine where the juvenile should be tried, the court was to weigh, essentially, the likelihood of rehabilitation against the risk to society. But now, with the enactment of EJJ, the court does not have to engage in this

type of analysis. By trying Kirk Otis as a juvenile, Kirk, if convicted, would have multiple programs offered for his treatment and rehabilitation. If he is successfully rehabilitated, he will at least be on supervised probation for a minimum of three years after his release. If he is not rehabilitated or the treatment is working but not completed, then the State can put Kirk in prison for a lifetime, or ideally impose any number of sentences and conditions less severe that would accomplish the same goals and continue treatment. Society is protected if the case goes to juvenile court, but there is no protection for Kirk Otis if this case remains in adult court.

\*\*\*

While the blended sentencing provisions of the EJJ do diminish the rationale for trying some juveniles in juvenile court and other juveniles in circuit court, in construing a statute, we will assume that the General Assembly, in enacting it, possessed the full knowledge of prior legislation on the same subject, and full knowledge of judicial decisions under preexisting law. *Bunch v. State*, 344 Ark. 730, 43 S.W.3d 132 (2001). That is, we must assume that the legislature was aware that with the enactment of the EJJ, it is still within the circuit court's discretion to deny a juvenile's motion to transfer to juvenile court, *even if the same sentencing provisions available in the criminal division of the circuit court are also available under the EJJ*. The legislature has vested prosecutors with the authority to file charges in either the juvenile division or the criminal division of the circuit court when a case involves a juvenile fourteen or fifteen years old when the juvenile engages in conduct that, if committed by an adult, would be capital murder. Ark. Code Ann. § 9-27-318(c)(2)(A) (Repl. 2002). In addition, the legislature has vested circuit judges with the authority to transfer or retain jurisdiction. *See* Ark. Code Ann. § 9-27-318(g), (h), and (I). Clearly, since the EJJ is discretionary, the legislature has determined that it is the policy of this State that the EJJ is not appropriate for all juveniles charged with serious offenses. It is well settled that it is for the legislature, not this court, to determine public policy. Otis has failed to demonstrate that § 9-27-318 is arbitrary or irrational.

Finally, we note that under the current appellate process, juvenile offenders often run the risk of losing the opportunity to be tried as a juvenile due to the passage of time. We have explained that an appeal from an order granting or denying transfer

of a case from one court to another having jurisdiction over juvenile matters must be considered by way of interlocutory appeal, and an appeal from such an order after a judgment of conviction in circuit court is untimely and will not be considered. *Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998).

 In this case, Otis was fourteen at the time he allegedly committed the offense. Otis was born on September 12, 1986. At the time of this writing, Otis is eight months shy of his eighteenth birthday, which means he is dangerously close to losing any opportunity to be rehabilitated through extended juvenile jurisdiction. The circuit court entered its order denying a transfer on September 5, 2002. It has taken over one year to have the case submitted to this court. In juvenile-transfer cases, time is of the essence, and the opportunity to rehabilitate under Arkansas law wanes with the passage of time. Accordingly, juvenile-transfer cases, being partially dependent on the passage of time, should be expedited.

Affirmed.

IMBER, J., concurring.

CORBIN, J., not participating.

ANNABELLE CLINTON IMBER, Justice, concurring. I write separately solely to express my view as to the quantum of proof necessary to support a finding of clear and convincing evidence that a juvenile should be tried as an adult under Ark. Code Ann. § 9-27-318(h) (Repl. 2002). It is imperative to note that, as a result of recent amendments to the juvenile code, the focus of concurrent jurisdiction between juvenile court and circuit court has shifted in favor of rehabilitation.

There was a time when the criminal information for murder provided a sufficient basis for a trial court to deny a transfer. *See, e.g., Walker v. State,* 304 Ark. 393, 803 S.W.2d 502 (1991). In 1997, this court unequivocally retreated from holding that a criminal information is a sufficient quantum of proof under the clear-and-convincing standard to support a finding that a juvenile should be tried as an adult. *See Thompson v. State,* 330 Ark. 746, 958 S.W.2d 1(1997) (decision under prior law, Ark. Code Ann. § 9-27-318(e) (Supp. 1997))(holding that the State must produce some evidence to substantiate the serious and violent nature of the

charges contained in the information). More recently, we have stated that because capital murder is a crime of a serious and violent nature, evidence of the defendant's involvement in a capital murder is a sufficient reason alone to affirm a circuit court's decision not to transfer the case to the juvenile division. *Sanford v. State, supra* (decision under prior law, Ark. Code Ann. § 9-27-318(e) (Supp. 1997)). At the time *Sanford* and *Thompson* were decided, section 9-27-318 listed only three statutory factors for the court to consider in a transfer hearing.

In 1999, Arkansas Code Annotated § 9-27-318 was rewritten by the General Assembly. Under the 1999 version of the statute, the number of factors the court is required to consider increased from three to ten. *Compare* Ark. Code Ann. § 9-27-318(e) (Supp. 1997), *with* 9-27-318(g) (Repl. 2002); *see also Beulah v. State,* 344 Ark. 528, 42 S.W.3d 461 (2001). Of particular importance is the statute's language directing the courts to consider "[w]hether there are facilities or programs available to the court which are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction." *See* Ark. Code Ann. § 9-27-318(g)(7) (Repl. 2002). Indeed, also in 1999, the General Assembly provided for extended juvenile jurisdiction (EJJ). *See* Ark. Code Ann. § 9-27-501 et seq. (Repl. 2002). The structure of EJJ allows the State to petition the circuit court at any time to impose an adult sentence. *See* Ark. Code Ann. § 9-27-507 (Repl. 2002). In addition, EJJ allows the court to maintain jurisdiction over the individual as a juvenile until he or she reaches the age of twenty-one. *See* Ark. Code Ann. § 9-27-303(29)(B) (Repl. 2002).

Based on these major changes in the Arkansas Juvenile Code, it is clear to me that the General Assembly has expressed a view that the juvenile court system is appropriate even in cases where there is a charge of capital murder and evidence of violence. As such, I believe that some evidence to substantiate the serious and violent nature of the crime charged is not by itself a sufficient quantum of proof under the clear-and-convincing standard to support a finding that the juvenile should be tried as an adult. In my view, the blended sentencing options available through EJJ require the courts to look more favorably upon rehabilitation as an option.