Cite as 2023 Ark. App. 197

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-22-197

| | |
|---|---|
| | Opinion Delivered April 5, 2023 |
| PHYSICIANS' SPECIALTY HOSPITAL, LLC **APPELLANT** | APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT [NO. 72CV-16-1370] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES, DIVISION OF MEDICAL SERVICES; AND THE ARKANSAS HOSPITAL ASSOCIATION **APPELLEES** | HONORABLE CRISTI BEAUMONT, JUDGE<br><br>AFFIRMED |

**MIKE MURPHY, Judge**

Physicians' Specialty Hospital (PSH) appeals the decision of the Washington County Circuit Court granting summary judgment on the issue of liability in favor of the Arkansas Department of Human Services, Division of Medical Services (DHS). On appeal, PSH argues that the circuit court erred in finding that the fee levied against it was a lawful assessment. Oral argument was held, and all counsel present provided thoughtful discussion helpful to this decision. We affirm.

On July 5, 2016, DHS commenced this action to recover unpaid assessments from PSH totaling $873,173.28, pursuant to the Hospital Assessment Fee Program, found at Arkansas Code Annotated sections 20-77-1901 et seq. (Repl. 2018). The stated purpose of the program is "to levy an assessment fee on hospitals to improve health care access for the

citizens of Arkansas." Act 562 of 2009. To do so, the program imposes a yearly assessment on nonexempt Arkansas hospitals in an amount calculated as a percentage of each hospital's net patient revenue. Ark. Code Ann. § 20-77-1902.

The assessments are paid into a designated "Hospital Assessment Account," which is a part of the Arkansas Medicaid Program Trust Fund. Ark. Code Ann. § 20-77-1904. That account is explicitly designated as "separate and distinct" from the General Revenue Fund Account of the State Apportionment Fund, and funds in it are supplementary to the Arkansas Medicaid Program Trust Fund. *Id.* "Moneys in the Hospital Assessment Account shall not be used to replace other general revenues appropriated and funded by the General Assembly or other revenues used to support Medicaid." Ark. Code Ann. § 20-77-1904(d). This money is matched by the United States Department of Health and Human Services, Centers for Medicare and Medicaid Services (CMS) and then distributed back to the participating hospitals pro rata to how many patients on Medicaid each hospital treats. Ark. Code Ann. § 20-77-1904(d).

The parties agree that a great majority of the levied hospitals realize a net gain under the program. PSH, however, does not. Over a four-year period, PSH alleges to have lost over a million dollars to the program, whereas other hospitals have realized a net gain of twenty million and more. Without question, if PSH accepted more Medicaid patients, it would receive more in access payments. But, PSH argues, it is a specialty hospital (a term of art in this area of law discussed in greater detail later) with twenty beds, "no real emergency room," and is "not equipped to 'accept' large numbers of Medicaid patients in order to make this

2

system work." PSH contends that because it is not "on the same footing" as "larger public hospitals" it could never accept enough Medicaid patients to have its tax bear a reasonable relationship to its assessment.

To that end, when DHS brought this action to recover unpaid assessment fees, PSH counterclaimed, alleging that the assessment was (1) an illegal exaction, (2) in violation of federal law, and (3) in violation of equal-protection principles. The counterclaim further sought to recoup $717,713.74 of assessments already paid by PSH under the program.

DHS moved for summary judgment on the issue of liability, which the circuit court granted. In that order, the court wrote that the program does not involve a "public fund" under article 16, section 13 of the Arkansas Constitution and that it is not a "tax." The court explained that "[t]he actual benefit of the [program] is maximized federal contribution, with greater payment to Medicaid hospital providers," resulting in lessened expenses for hospitals and Arkansans. It found that PSH benefits from the payments from the program directly in proportion to its Medicaid discharges. The court further found that the program, fees, and payments are fair and reasonable and in compliance with federal regulations and the CMS waiver requirements. Finally, the court found that the program is rationally based on legitimate government objectives, and PSH did not demonstrate any equal-protection violations.

PSH timely appealed the grant of summary judgment.

As we have often stated, summary judgment is to be granted by a circuit court if the pleadings, depositions, answers to interrogatories and admissions on file, together with

3

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ark. R. Civ. P. 56; *Gonzales v. City of DeWitt*, 357 Ark. 10, 14–15, 159 S.W.3d 298, 301 (2004). The purpose of summary judgment is not to try the issues but to determine whether there are any issues to be tried. *Fryar v. Roberts*, 346 Ark. 432, 57 S.W.3d 727 (2001).

Summary judgment is to be granted by a circuit court only when there are no genuine issues of material fact to be litigated and the moving party is entitled to judgment as a matter of law. *Id.* Once a moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appeal, we determine if summary judgment was appropriate by deciding whether the evidentiary items presented by the moving party in support of its motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review is not limited to the pleadings—we also focus on the affidavits and other documents filed by the parties. *Id.* After reviewing undisputed facts, summary judgment should be denied if, under the evidence, reasonable men might reach different conclusions from those undisputed facts. *Allen v. Allison*, 356 Ark. 403, 413, 155 S.W.3d 682, 689 (2004).

## I. *Fee or Tax*

PSH does not argue that there are material facts in dispute; instead, it contends that the court erred in its application of the facts to the law. It first explains that the circuit court

4

erred in finding that the fee imposed by the program is not a "tax." The distinction is important because unless the fee is a "tax," PSH's illegal-exaction arguments automatically fail.

Illegal-exaction lawsuits in Arkansas are authorized under article 16, section 13 of the Arkansas Constitution, which provides, "Any citizen of any county, city or town may institute suit on behalf of himself and all others interested, to protect the inhabitants thereof against the enforcement of any illegal exactions whatever." An illegal exaction is defined as any exaction that either is not authorized by law or is contrary to law. *McCafferty v. Oxford Am. Literary Project, Inc.*, 2016 Ark. 75, at 2–3, 484 S.W.3d 662, 664. Two types of illegal-exaction cases can arise under article 16, section 13: "public funds" cases, where the plaintiff contends that public funds generated from tax dollars are being misapplied or illegally spent; and "illegal tax" cases, where the plaintiff asserts that the tax itself is illegal. *Id.* PSH challenges the assessment as an "illegal tax" exaction case. To bring an illegal-exaction claim based on an "illegal tax," the exaction must be a tax and not a fee. *Morningstar v. Bush*, 2011 Ark. 350, at 6–7, 383 S.W.3d 840, 845.

The distinction between a tax and a fee is that government imposes a tax for general-revenue purposes, but a fee is imposed in the government's exercise of its police powers. *Rose v. Ark. State Plant Bd.*, 363 Ark. 281, 292, 213 S.W.3d 607, 616–17 (2005). Taxing power is usually exercised to provide funding for public services at large, while police power is usually exercised to cover the cost of administering a regulatory scheme or providing a service. *See generally Morningstar*, *supra*. A fee may be assessed for providing a service without obtaining

5

public approval. *Id.* In order not to be denominated a tax by the courts, a governmental levy of a fee must be fair and reasonable and bear a reasonable relationship to the benefits conferred on those receiving the services. *Id.*

PSH first argues that because in some reports and depositions DHS refers to the access fee as a tax, the circuit court necessarily erred when it did not find the assessment to be a tax. However, the fact that the levy is labeled a " fee," not a "tax," is not binding, and this court looks to the true character of the levy to determine which it is. *Id.*

In *Rose*, the levies at issue were collected to fund a boll-weevil-eradication program, and it was important that the assessments were "only charged to those persons who will directly benefit from the eradication program, namely the cotton growers in the eradication zone," and that the money collected was not deposited into the state's general revenue or the Plant Board's revenue. "Moreover," the court wrote, "the fees do not exceed the estimated costs proposed by the [cotton grower organizations], and they bear a reasonable relationship to the benefits conferred on the growers. Accordingly, we affirm the trial court's conclusion that the fees levied by the Board under the Act are not taxes[.]" *Rose*, 363 Ark. at 292, 213 S.W.3d at 617.

Similarly, in *Holman v. City of Dierks*, 217 Ark. 677, 678, 233 S.W.2d 392, 393 (1950), an annual $4 sanitation charge per business and residence was held to be a fee "for services to be rendered," and not a tax, when it was collected and used to pay for fogging the city three times year with insecticide. However, in *City of North Little Rock v. Graham*, a "public safety fee" added to residents' water bills was a "tax" because its purpose was to increase

police salaries, which the court wrote was more of a "means of raising revenue to pay additional money for services already in effect," instead of a specific, special service or scheme. 287 Ark. 547, 549, 647 S.W.2d 452, 453 (1983).

PSH argues that, here, the hospital assessments imposed under the program are charged to and paid by the hospitals, "which derive no direct benefit from the assessments." PSH instead contends that the Medicaid recipients are the true beneficiaries, but they are not the ones paying the assessment. We are not so persuaded. Here, the money collected is deposited into a Hospital Assessment Account, separate and distinct from the general revenue. It is collected with the purpose of being matched with federal funds and redistributed to those same levied hospitals on the basis of the amount of Medicaid patients each hospital treats. Medicaid provides funding for medical services to the poor. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004). Accordingly, the fees at bar are collected for a specific purpose that bears a reasonable relationship to the benefits conferred on those levied: defraying the hospital costs associated with treating Medicaid patients. *See, e.g., id.* ("A hospital that treated an unusually high number of low-income patients therefore would be treating an unusually high number of patients who tend to be sicker, and to cost more to treat, than others."). The court did not err, as a matter of law, when it determined that the program assessments are fees and not taxes.

II. *Federal Compliance and the CMS Waiver*

PSH next challenges the finding that the assessment complies with the relevant federal regulations and the CMS waiver. The Hospital Assessment Fee Program was designed

to take advantage of a federal program providing additional funding for treating Medicaid patients. Under this federal program, hospital-provider taxes must be broad based and uniformly applied, but federal law permits a state to request a waiver of the broad-based requirement, including the uniformity requirement from the CMS. 42 U.S.C. § 1396b(w)(3)(E); 42 C.F.R. §§ 433.68(c)(3), 433.72 (2008) WL 42 CFR §§ 433.68, 433.72. CMS has discretion to approve such waivers upon a showing that the net impact of the provider fee is generally redistributive in nature, and the amount of the provider fee is not directly correlated to payments for items or services with respect to which the provider fee is imposed. 42 U.S.C. § 1396b(w)(3)(E)(ii); 42 C.F.R. §§ 433.68(c)(2), 433.72(b).

The assessment-fee program, as it is written in Arkansas, provides that some hospitals may be exempted from the assessment imposed, necessarily requiring a CMS waiver. Hospitals excluded from paying the fee in Arkansas include (1) hospitals that are not privately operated hospitals (that is, government-run hospitals); (2) hospitals licensed by DHS as rehabilitation hospitals; and (3) specialty hospitals. Ark. Code Ann. § 20-77-1905. A "specialty hospital" as defined in the Arkansas Code as any hospital that "limits services primarily to children and qualifies as exempt from the Medicare prospective payment system regulation; or is primarily or exclusively engaged in the care and treatment of patients with cardiac conditions." Ark. Code Ann. § 20-77-1901.

Due to the presence of these exemptions, once the legislation passed, DHS sought a waiver of the broad-based requirements from CMS. According to the waiver-request letter, the recently adopted legislation at issue was attached. CMS granted the waiver request. In

the return correspondence from CMS granting the waiver, the language discussing the exemptions mirrors the language and structure of Ark. Code Ann. § 20-77-1905. The waiver provided the following:

(i) Hospitals that are not privately operated are excluded from the tax;

(ii) Rehabilitation hospitals are excluded from the tax;

(iii) Specialty hospitals are excluded from the tax;

Section 1903(w)(3)(E) of the Act specifies that the Secretary shall approve broad-based (and uniformity) waiver applications if the net impact of the tax is generally redistributive and that the amount of the tax is not directly correlated to Medicaid payments.

PSH argues that "specialty hospital" as it is defined in the Arkansas Code is not the same as a "specialty hospital" as it is defined in the Social Security Act, and it cites 42 U.S.C. § 1395nn(h)(7) for the proposition that "specialty hospital" as it was used in the CMS waiver meant hospitals treating patients with cardiac or orthopedic conditions or patients receiving surgery. We are not persuaded. "Specialty hospital" is not defined in the Social Security Act anywhere beyond section 1395nn(h)(7), where it is addressed as only "for purposes of this section," a section dedicated to discussion of limitations of certain physician referrals. Nor is there indication that CMS was referring to this definition from 42 U.S.C. § 1395nn(h)(7) when it was agreeing to exempt "specialty hospitals" when replying to the waiver request specifically sought due to the legislature's exemptions located in Arkansas Code Annotated section 20-77-1905.

PSH additionally argues that the assessment was not uniformly applied because, when

calculating the assessment, DHS used different-year cost reports and revenue percentages for different hospitals. The record, however, established that DHS used the most recently audited cost reports it had available to calculate the assessment for each hospital in the state of Arkansas, a policy uniformly applied. Regarding the different percentages, Arkansas Code Annotated section 20-77-1902(a)(2) explains that the assessment rate is

> determined annually based upon the percentage of net patient revenue needed to generate an amount up to the nonfederal portion of the upper payment limit gap plus the annual fee to be paid to Medicaid under § 20-77-1904(f)(1)(C), but in no case at a rate that would cause the assessment proceeds to exceed the indirect guarantee threshold set forth in 42 C.F.R. § 433.68(f)(3)(i).

So, while the result may have amounted to a "different percentage" for each hospital, it was again calculated using a method applied uniformly to all the hospitals. The circuit court's finding that the assessment complies with the relevant federal regulations and the CMS waiver was not erroneous.

### III. *Equal Protection*

Finally, the circuit court dismissed PSH's equal-protection counterclaim. The equal protection provisions of the Arkansas Constitution are applied using the same test as is applied in evaluating claims under the federal Equal Protection Clause. *Streight v. Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). It is settled law in Arkansas that to bring an Equal Protection claim to challenge an assessment fee or state tax, there must be, at a minimum, factual allegations that similarly situated payers are treated differently and there is no hypothetical rational basis for the different treatment. U.S. Const. amend. 14, § 1; Ark.

10

Const. art. 2, §§ 2, 3; *Rose, supra.* Although this case does not involve a tax, the case law analysis of an equal-protection claim challenging an assessment fee and tax is the same. *Rose, supra.*

The equal-protection clause permits classifications that have a rational basis and are reasonably related to a legitimate government purpose. *Otis v. State*, 355 Ark. 590, 142 S.W.3d 615 (2004). Equal protection does not require that persons be dealt with identically; it only requires that classification rest on real and not feigned differences, that the distinctions have some relevance to the purpose for which the classification is made, and that their treatment be not so disparate as to be arbitrary. *Id.* When reviewing an equal-protection challenge, it is not this court's role to discover the actual basis for the legislation. *Id.* Rather, we consider whether there is any rational basis that demonstrates the possibility of a deliberate nexus with state objectives so that legislation is not the product of arbitrary and capricious government purposes. *Id.* If a rational basis exists, the statute will withstand constitutional challenge. *Id.* Under the rational-basis test, legislation is presumed constitutional and rationally related to achieving any legitimate governmental objective under any reasonably conceivable fact situation. *Eady v. Lansford*, 351 Ark. 249, 92 S.W.3d 57 (2002). The burden is on the party challenging the legislation to prove its unconstitutionality. *Id.*

Again, the Hospital Assessment Fee Program was enacted with the stated purpose of levying an assessment fee on hospitals to improve health-care access for the citizens of Arkansas. That program excepts some hospitals from paying the fee. PSH argues that there

11

is no rational basis for treating it (an orthopedic hospital) differently than the exempted hospitals. However, "[i]nherent in the power to tax is the power to discriminate in taxation." *Leathers v. Medlock*, 499 U.S. 439, 451 (1991); we cannot strike down an entire classification merely because it is underinclusive. *Medlock v. Leathers*, 311 Ark. 175, 179, 842 S.W.2d 428, 430–31 (1992). One of the reasons suggested by the amicus and DHS for not exempting a hospital like PSH includes the hypothesis that orthopedic specialty hospitals do not adequately serve Medicaid-eligible patients throughout the state; therefore, they were not excluded from the assessment fee to encourage them to serve Medicaid-eligible patients. This is a conceivable rational basis sufficient to satisfy equal protection. *Medlock*, 311 Ark. 175, 842 S.W.2d 428.

Importantly, nothing in the statute prevented PSH from taking advantage of the obvious benefits of the statute. PSH could have taken on more Medicaid patients, but it did not. PSH's failure to do so does not make the entire statute unconstitutional. *See Landers v. Stone*, 2016 Ark. 272, at 16, 496 S.W.3d 370, 380 (explaining that an argument that "laws are underinclusive, by allowing a select few to briefly evade their strictures, provides no reason at all to hold that the statutes are unconstitutional"); *see also City of Marion v. Baioni*, 312 Ark. 423, 428, 850 S.W.2d 1, 4 (1993) (rejecting equal-protection argument that the city treated nonresident users of water and sewer differently than residents). We give "great deference to the General Assembly in the legislation of taxation where the clear intent of the statute is to raise revenue and not to discriminate among similarly situated individuals." *Medlock*, 311 Ark. at 180, 842 S.W.2d at 431.

Affirmed.

HARRISON, C.J., and BARRETT, J., agree.

*Murphy, Thompson, Arnold, Skinner & Castleberry*, by: *Kenneth P. "Casey" Castleberry*; and *Everett Law Firm*, by: *John C. Everett*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Maryna Jackson*, Sr. Ass't Att'y Gen., for separate appellee Arkansas Department of Human Services.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Megan D. Hargraves* and *Cara D. Butler*, for separate appellee Arkansas Hospital Association.