Cite as 2021 Ark. App. 418

# ARKANSAS COURT OF APPEALS

DIVISION II
**No.** CR-20-635

| | |
|---|---|
| A.M.<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered** November 3, 2021<br><br>APPEAL FROM THE MILLER COUNTY CIRCUIT COURT<br>[NO. 46JV-17-35]<br><br>HONORABLE KIRK JOHNSON, JUDGE<br><br>AFFIRMED |

## BRANDON J. HARRISON, Chief Judge

A.M. was adjudicated delinquent on charges of capital murder and aggravated robbery. He now appeals the circuit court's rulings that (1) found him fit to proceed and (2) denied his motion for directed verdict as to both charges. We affirm the circuit court's rulings.

On 2 February 2017, twelve-year-old A.M. was arrested for the murder of Christa Shockley. The State's petition for delinquency explained that A.M. had entered a convenience store, shot the clerk (Shockley) seven times, and exited the store. Moments later, A.M. reentered the store, took a vapor cigar pack and headphones, and exited again. The State's petition alleged that A.M. had committed aggravated robbery and capital murder by causing a death in the course of or in furtherance of a felony, or alternatively by causing a death in a premeditated and deliberate manner. Due to A.M.'s age, the State could not charge him as an adult in the criminal division of circuit court. The State requested an

extended-juvenile-jurisdiction (EJJ) designation, which was granted by the circuit court.[1] The court determined that A.M. was fit to proceed, and a jury trial commenced on 6 July 2020. The jury found that A.M. had committed the offenses as charged, and he was adjudicated delinquent and committed to the Division of Youth Services. Specific facts related to his points on appeal are discussed below. Although A.M.'s sufficiency argument is his second point on appeal, we address this issue first because double-jeopardy concerns require a review of the sufficiency of the evidence prior to a review of any asserted trial errors. *Stewart v. State*, 2010 Ark. App. 323, 374 S.W.3d 811.

## I. *Directed Verdict*

The circuit court convened A.M.'s jury trial on 6 July 2020, at which the following pertinent evidence was presented. Les Moody, a former law enforcement officer with the Miller County Sheriff's Office, responded to the E–Z Mart store in Fouke at approximately 3:10 a.m. on 2 February 2017. He viewed the video from the store's security system and saw a white male enter the store and start shooting at the store's clerk, Christa Shockley. The suspect was wearing a red hoodie and a black backpack, and a white bandana with black markings was covering his face. Moody reviewed video footage from earlier that evening and saw the same suspect go in and out of the store four different times; the suspect was not wearing a face covering in the earlier footage, and Moody was able to capture an

---

[1]This court affirmed the circuit court's order granting EJJ designation in September 2019. *See A.M. v. State*, 2019 Ark. App. 357, 584 S.W.3d 253.

2

image of the suspect's face, which he sent to the investigators. One of the investigators immediately recognized the suspect as A.M.

Moody described A.M.'s movements that evening as shown in the store's video and noted that at one point, when Shockley was out of sight and presumably in the store's refrigerated section in the back of the store, A.M. had gone behind the counter and taken some electronic cigarettes; he then walked to the front of the counter, took an energy drink, and exited the store. Less than thirty minutes later, A.M. reentered the store, shot Shockley, and exited the store again. Within ten minutes, A.M. entered the store once again and took additional items from the store.

Officer Wesley Penny also responded to the scene and recognized the photo of A.M. Penny had met A.M. and his family approximately two weeks before the incident, when Penny found A.M. walking alone along the highway late at night and had taken him home. Penny and Moody visited A.M.'s residence at approximately 8:00 a.m., but there was no one home. Penny called the resource officer at the middle school and asked him to locate A.M. and escort A.M. to his (the officer's) office. The resource officer did so, and Penny and Moody went to school and placed A.M. under arrest. A.M.'s father gave Penny permission to interview A.M., and A.M. confessed to the shooting and stealing items from the store. When asked why he had shot the clerk, A.M. first said he did not know but later said that she looked like a friend of his mother's who used to beat him. He admitted that he had taken his father's gun and was aware that he had to return home by a certain time to return the gun before his father woke up.

After the State rested, defense counsel moved for a directed verdict:

3

Your Honor, let me take the felony murder first. I would argue that there has not been sufficient proof to show that an aggravated robbery occurred. There was a theft and there was a killing, but there's no nexus or connection between the two, and so I would contend that the fact finder would have to resort to speculation or conjecture to find that aggravated robbery itself has occurred, that someone employed force as a means of committing a theft, or employed that force in—or resisting apprehension of a theft.

Defense counsel also asserted that the premeditated and deliberate portion of the capital-murder allegation had not been established by the evidence. The circuit court denied the motion, finding that

there is sufficient evidence to go forward on the aggravated robbery. Motion for directed verdict is denied as to that issue, as well as to the capital murder issue. The Court finds that the video that's been shown clearly shows that this was premeditated and deliberate. As to the aggravated robbery, it appeared to the Court that the Defendant shot the victim, walked over close to her, walked outside the store, went back in, and it appeared that he waited until she had either passed out or expired, came back in and took the items of property which were recovered from him. And I think that would fit the definition of aggravated robbery and that the murder was for the purpose of committing a theft or resisting apprehension immediately thereafter.

Defense counsel renewed the motion for directed verdict at the appropriate times later in the trial.

On appeal, A.M. challenges the circuit court's denial of his directed-verdict motion. We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other

4

without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Id.* Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

Aggravated robbery occurs if, with the purpose of committing a felony or misdemeanor theft, a person employs or threatens to employ physical force upon another person and is "armed with a deadly weapon" or inflicts death upon another person. Ark. Code Ann. § 5-12-103(a) (Repl. 2013). A.M. committed capital–felony murder if (1) he committed or attempted to commit aggravated robbery and "in the course of and furtherance of" that aggravated robbery he or an accomplice caused the death of another person "under circumstances manifesting extreme indifference to the value of human life," or (2) with the premeditated and deliberated purpose of causing the death of another person, he causes the death of a person. Ark. Code Ann. § 5-10-101(a)(1)(B) & (3) (Repl. 2013).

In a capital-felony murder case, the State must first prove the felony, so the felony becomes an essential element of the murder charge. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). A strict causal relationship between the felony and the murder is unnecessary; rather, "the State need only prove that the robbery and the murder were parts of the same transaction, or occurred within the same brief interval." *See Norris v. State*, 2010 Ark. 174,

5

at 6, 368 S.W.3d 52, 56 (quoting *Clay v. State*, 324 Ark. 9, 12, 919 S.W.2d 190, 191–92 (1996)). Our supreme court has held,

> Where the robbery and the killing are so closely connected in point of time, place[,] and continuity of action as to constitute one continuous transaction[,] it is proper to consider both as a single transaction and the homicide as a part of the res gestae of the robbery. The sequence of events is unimportant and the killing may precede, coincide with[,] or follow the robbery and still be committed in its perpetration.

*Jenkins v. State*, 350 Ark. 219, 227–28, 85 S.W.3d 878, 882–83 (2002) (quoting *Grigsby v. State*, 260 Ark. 499, 508–09, 542 S.W.2d 275, 280–81 (1976) (citations omitted)).

A.M. does not dispute that he was armed with a deadly weapon or that he inflicted death upon another person. He does argue, however, that the State failed to prove that he did so with the purpose of committing a theft. He contends that the undisputed facts show that he entered the store, shot the clerk without demanding any money or property from her, and then exited the store. He then reentered the store and took some items from the store. A.M. asserts that the State failed to connect the misdemeanor theft with his use of deadly force because there is no evidence, direct or circumstantial, that he used deadly force to facilitate the misdemeanor theft. He asserts that even viewing the evidence in the light most favorable to the State, the jury was left to speculate that the deadly force was employed with the purpose of committing a theft. Thus, the circuit court should have directed a verdict on the aggravated-robbery charge and, in turn, the capital felony-murder charge.[2]

---

[2]A.M. also notes that we cannot know under what theory the jury found him guilty of capital murder because the jury returned a general verdict. The defense asked for special verdict forms, but the circuit court denied the request. A.M. concedes that his case presents a factually insufficient claim and asks this court to revisit the distinction between factually insufficient and legally insufficient theories as held in *Torres v. State*, 2019 Ark. 101, 571

6

A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence. *Robinson v. State*, 353 Ark. 372, 108 S.W.3d 622 (2003). Intent to commit a robbery may be inferred from the facts and circumstances of the particular case. *Jenkins*, *supra*. Viewing the evidence in the light most favorable to the State, the store's video surveillance showed that within an approximate timeframe of forty-five minutes, A.M. entered the store, took some items, and exited; entered the store again, shot the store clerk, and exited; and entered the store once again and took additional items. Under these circumstances, the jury was free to find that A.M. acted with the intent to commit aggravated robbery and that the murder occurred "in the course of and in furtherance of" that aggravated robbery. Thus, we hold that substantial evidence supports the verdict.

## II. *Fitness to Proceed*

Arkansas Code Annotated section 9-27-502 provides that

> (b)(1)(A) For a juvenile under thirteen (13) years of age at the time of the alleged offense and who is charged with capital murder, § 5-10-101, or murder in the first degree, § 5-10-102, there shall be a presumption that:
>
> (i) The juvenile is unfit to proceed; and
>
> (ii) He or she lacked capacity to:
>
> *(a)* Possess the necessary mental state required for the offense charged;
>
> *(b)* Conform his or her conduct to the requirements of law; and

---

S.W.3d 456 (citing with approval *Griffin v. United States*, 502 U.S. 46 (1991) and holding that legally insufficient alternatives cannot be upheld in a general verdict but factually insufficient alternatives can, provided at least one charged alternative is supported by sufficient evidence). This argument was not raised below and cannot be addressed for the first time on appeal. *Nichols v. State*, 2021 Ark. App. 368. Further, this court has no authority to overrule decisions made by our supreme court. *Boston v. State*, 2020 Ark. App. 551, 613 S.W.3d 764.

*(c)* Appreciate the criminality of his or her conduct.

(B) The prosecution must overcome these presumptions by a preponderance of the evidence.

(2)(A) For juveniles under thirteen (13) years of age and who are charged with capital murder, § 5-10-101, or murder in the first degree, § 5-10-102, the court shall order an evaluation to be performed in accordance with § 5-2-305(b) by a psychiatrist or a clinical psychologist who is specifically qualified by training and experience in the evaluation of juveniles.[3]

Ark. Code Ann. § 9-27-502(b)(1) & (2) (Repl. 2013).  In evaluating a juvenile's fitness to proceed, the examiner is required to consider and make written findings regarding whether the juvenile's capabilities entail the following:

*(A)* An ability to understand and appreciate the charges and their seriousness;

*(B)* An ability to understand and realistically appraise the likely outcomes;

*(C)* A reliable episodic memory so that he or she can accurately and reliably relate a sequence of events;

*(D)* An ability to extend thinking into the future;

*(E)* An ability to consider the impact of his or her actions on others;

*(F)* Verbal articulation abilities or the ability to express himself or herself in a reasonable and coherent manner; and

*(G)* Logical decision-making abilities, particularly multifactored problem solving or the ability to take several factors into consideration in making a decision; and

*(2)* Developmentally, does the juvenile have:

---

[3]In August 2017, the General Assembly amended the statute and removed the language requiring an evaluation "by a psychiatrist or a clinical psychologist who is specifically qualified by training and experience in the evaluation of juveniles."  *See* 2017 Ark. Act 472.

*(A)* An ability to understand the charges;

*(B)* An ability to understand the roles of participants in the trial process, i.e., judge, defense attorney, prosecutor, witnesses, and jury and understand the adversarial nature of the process;

*(C)* An ability to adequately trust and work collaboratively with his or her attorney and provide a reliable recounting of events;

*(D)* An ability to reason about available options by weighing their consequences, including, but not limited to, weighing pleas, waivers, and strategies;

*(E)* An ability to disclose to an attorney a reasonably coherent description of facts pertaining to the charges, as perceived by the juvenile; and

*(F)* An ability to articulate his or her motives[.]

Ark. Code Ann. § 9-27-502(b)(7)(C)(ix)*(b)(1) & (2)*.

Accordingly, on 17 April 2017, the circuit court ordered that A.M. undergo a fitness-to-proceed examination. On August 29, a forensic report prepared by Dr. Benjamin Silber, a psychologist with the Arkansas State Hospital, was filed with the court. Dr. Silber concluded that at the time of examination, A.M. did not have a mental disease or defect but did meet the criteria for conduct disorder (childhood-onset type, severe) and provisional autism spectrum disorder (without accompanying intellectual impairment or language impairment). Dr. Silber noted his belief that "the data is equivocal," but stated, "I am more confident than not, at the time of the examination, [A.M.] **had** the capacity to effectively assist his attorney in his own defense" and "**had** the capacity to understand the proceedings against him." (Emphasis in original.)

The circuit court convened a competency hearing on 16 November 2017. Dr. Silber testified that he had received his clinical psychology Ph.D. in 2014 and had performed

9

approximately 250 to 300 fitness-to-proceed examinations. He said that approximately 35 to 40 of those examinations had been of juveniles. He also explained that he had advanced training in working with juvenile offenders as part of his forensic fellowship, which included performing a number of evaluations of juveniles under the supervision of the fellowship director, participating in didactic seminars, and receiving case readings on juvenile defendants. The defense objected to Dr. Silber's being recognized as an expert witness in forensic psychology, arguing that Ark. Code Ann. § 9-27-502 requires that the assigned clinical psychologist be specifically qualified by training and experience in the evaluation of juveniles and that Dr. Silber did not have the requisite experience. The court overruled the objection and found that Dr. Silber met the requirements of the statute.

Dr. Silber explained that he examined A.M. on June 27 and again on August 17, 2017. Dr. Silber took the unusual step of examining A.M. twice because he received more records after the first interview and had been able to interview A.M.'s father. According to Dr. Silber, he wanted to "double check some of the things that I previously assumed or I believed to be true, and, furthermore, I also wanted to see if some of the information he provided me the first time would change." Dr. Silber confirmed that he had found A.M. did not have a mental disease or defect but had diagnosed A.M. with conduct disorder and provisional autism spectrum disorder. He explained that conduct disorder describes a pattern of behavior in which the individual violates the norms, rules, and expectations of society and often disregards the well-being and emotions of other people. Autism spectrum disorder is characterized by deficits in communication and social interaction and problems with very repetitive routines, behaviors, or interests. Dr. Silber also stated that A.M. had

10

been given a personality assessment specifically for adolescents and had scored highly in antisocial and paranoia traits. Dr. Silber opined that neither of A.M.'s disorders would prohibit him from assisting defense counsel or understanding the charges against him.

Dr. Silber disagreed with the opinion of Dr. Charles Ewing, another forensic psychologist, who diagnosed A.M. with schizophrenia. In his report, Dr. Silber identified a number of A.M.'s claims that had been classified as delusions by Dr. Ewing: (1) A.M. claims to be the leader of a local gang that buys drugs from a Mexican cartel and sells drugs on the streets; (2) the members of his gang wear bulletproof vests, carry automatic weapons and use subsonic ammunition, and regularly engage in shootouts, robberies, and murders in which the bodies are burned; (3) his mother introduced him to Satanism and he was a Satan worshipper until recently; and (4) he had severely injured a man by breaking his leg, his arm, his wrist, and four of his ribs. Dr. Silber did not believe these were delusions; instead, he noted that A.M. had a reputation for "embellishing, as exaggerating, as lying, as fantasizing" and that in his opinion, A.M. did not actually believe these things. Dr. Silber also explained that delusions are, by nature, fixed and that there were "a lot of inconsistencies" in A.M.'s statements, both to him (Dr. Silber) and to Dr. Ewing. Dr. Silber said that A.M. had been given an intelligence test and scored an IQ of 102, which is in the average range for his age. In addition, A.M.'s responses to a specialized juvenile adjudicative competence interview had been "accurate" and "realistic" and raised no concerns that A.M. could not assist counsel or understand the charges against him. Regarding the statutory factors on the A.M.'s capabilities, Dr. Silber found A.M. to be sufficiently capable.

On cross-examination, Dr. Silber confirmed that he had been licensed to conduct forensic examinations in Arkansas for "a little over two years" and that he had never been qualified to testify as an expert in juvenile matters. He also agreed that he used the word "equivocal" to describe some of the data upon which he based his findings. Dr. Silber clarified,

> I wouldn't say that every opinion I have is equivocal. There were certain opinions that I had that I felt were based on equivocal information. So here what I was referring to was his ability to assist his attorney. So, for example, the next opinion that he had the capacity to understand, I am very—I'm quite confident in that. His ability to assist is where I believe there is some equivocal data[.]

The following question-and-answer exchange also occurred during cross-examination:

DEFENSE COUNSEL:	Is it fair to say, when you're addressing the ability to disclose to an attorney a reasonably coherent description of facts pertaining to the charges, that at the time of your report, and I assume at this time, that you have persistent concerns about his fitness to proceed?

DR. SILBER:	I think that there are some concerns, yes.

DEFENSE COUNSEL:	Your words are persistent?

DR. SILBER:	Can you direct me to where --?

DEFENSE COUNSEL:	I can. Page 18, bottom of the page, the last sentence, "However..."

DR. SILBER:	Oh. "...my concerns around this persist and are my only primary concern." Yes.

DEFENSE COUNSEL:	For his fitness to proceed?

DR. SILBER:	Yes.

DEFENSE COUNSEL:	You also go on to write the next sentence which is underlined, I assume for emphasis.

12

DR. SILBER:                Correct.

DEFENSE COUNSEL:    "Whether this is sufficient for a finding of lack of fitness to proceed, it is worth considerable reflection."

DR. SILBER:                Yes.

DEFENSE COUNSEL:    When I couple that with the equivocal data that you stated you had to rely on, is this, the opinions you've made, you said you believe this to be true and believe he can assist, are these sufficient to rise to the level of medical certainly? [sic] I'm not sure what bar y'all use to make the opinions.

DR. SILBER:                There isn't anything in the Arkansas statute, but usually psychological certainty is what most psychologists say, and generally that's just considered more likely than not.

DEFENSE COUNSEL:    Okay. So at this point, do you feel like you're within the scientific certainty—is that the right word?

DR. SILBER:                Yes. I'm more confident than not that this is the case, but I do still think that it is worth a lot of considerable reflection. I spent a lot of time thinking about this exact issue when I was writing the report, and it's part of the reason why I wanted to go back and see him a second time. It is part of that desire to have more reflection before I made any sort of an opinion since the courts typically ask for a simple yes or no answer.

For the defense, Dr. Ewing testified that he had been a licensed psychologist since 1979 and had been board certified in forensic psychology since 1987. He stated that he had conducted thousands of evaluations, "a quarter to a half" of those with juveniles. He also said that he specialized in youth violence and had published two books on juvenile homicide. Dr. Ewing described A.M. as "severely mentally ill" and opined that A.M. suffers

13

from autism spectrum disorder and schizophrenia. He said that he and Dr. Silber agreed on the autism diagnosis, and their disagreement on the schizophrenia diagnosis boiled down to whether A.M. is delusional. Dr. Silber believes that A.M. is merely fantasizing, while Dr. Ewing believes that A.M. is delusional and notes that he also has a flat affect, which supports the schizophrenia diagnosis. Dr. Ewing strongly disagreed with Dr. Silber's statement that delusions must be fixed. According to Dr. Ewing, delusions can and often do change due to psychotherapy, medications, or environmental changes. Dr. Ewing questioned A.M.'s capacity on a number of the factors listed in section 9-27-502, most notably, his ability to adequately trust and work collaboratively with his attorney and provide a reliable accounting of events:

> That's where the most serious concern is. He can't give you an adequate accounting of his history and events leading up to and including the crime for which he's charged. That's why I felt it was so important for me to see you and him interacting together. And I came away with the impression—the conclusion that he can't really work with counsel at this time. Maybe at some point, when his delusions are treated, when his mental illness is in better control and is in remission, he can, but at this point I would say neither you nor any attorney could collaboratively work with him because you can't rely upon what he's telling you.

Dr. Ewing stated unequivocally that A.M. does not have the capacity to understand the proceedings against him and could not effectively assist his counsel in his defense.

On cross-examination, Dr. Ewing confirmed that this was the only forensic examination he had ever performed in Arkansas and that he had never testified or been declared an expert in Arkansas. He agreed that Asperger's syndrome is now part of the autism spectrum and its description includes a high-functioning autistic person such as A.M.

14

He also agreed that a symptom of Asperger's is having a flat affect. He stated that it is not common for a child to be diagnosed with schizophrenia.

After taking the matter under advisement, the circuit court issued its ruling on 9 January 2018. The court found that Dr. Silber's testimony had shown by a preponderance of the evidence that A.M. had the fitness to proceed to trial.

> The analysis of the interview of the juvenile by Dr. Silber is unbiased, comprehensive[,] and complete and bolstered by the facts as found in the documents he has reviewed and from the interviews with witnesses and especially the interview with the juvenile and his conclusions from that interview.
>
> . . . .
>
> The alleged delusional beliefs relied upon so heavily by Dr. Ewing in his report and testimony were not present in the interview with Dr. Silber until Dr. Silber . . . specifically asked the juvenile about his gang involvement. It is clear to the Court that he was not suffering from delusions when talking to Dr. Silber regarding gang involvement or delusional behavior or thought processes would have emerged during the interview without prompting. Further, the juvenile's alleged delusion that he had gang involvement was not brought up by him in the interview with sheriff's investigators as a reason or justification as to why he killed the clerk. In fact, his explanation for killing the clerk had nothing to do with any drug cartel or gang obsession but instead he explained that it was his mistaken belief that the clerk was a friend of his mother who had disciplined him repeatedly when he lived with his mother and he sought vengeance for his alleged mistreatment at her hands.
>
> . . . .
>
> Dr. Silber's observations that the alleged delusion was not fixed is borne out by the juvenile's interview and the facts of the case. Dr. Silber's diagnosis that the juvenile does not suffer from Schizophrenia is simply more credible than the opinion of Dr. Ewing who opined that he suffered from Schizophrenia based on delusions and flat affect displayed to him. . . . There is simply no evidence that the juvenile was suffering from a delusion at the time of the crime or immediately thereafter.

15

On appeal, A.M. argues that the circuit court erred in finding him fit to proceed because (1) Dr. Silber was not specifically qualified by training and experience to evaluate juveniles, and (2) the State's evidence was insufficient to overcome A.M.'s presumptive lack of fitness. As a reminder, section 9-27-502(b)(2) requires the fitness evaluation to be performed by a psychiatrist or a clinical psychologist who is specifically qualified by training and experience in the evaluation of juveniles. The statute also provides that there is a presumption that the juvenile is unfit to proceed, and the State must overcome that presumption by a preponderance of the evidence.

There are no appellate cases specifically stating the standard of review for a circuit court's determination of fitness to proceed in a juvenile case. A.M. states that this court should employ the substantial–evidence standard of review utilized in adult criminal cases. In criminal proceedings, the test for competency to stand trial is whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational, as well as a factual, understanding of the proceedings against him. *Thessing v. State*, 365 Ark. 384, 230 S.W.3d 526 (2006). The test for competency on appeal is whether substantial evidence supports the circuit court's finding. *Cage v. State*, 2017 Ark. 277, 528 S.W.3d 825. There is substantial evidence if the evidence is forceful enough to compel reasonable minds to reach a conclusion one way or the other and requires more than mere speculation or conjecture. *Thessing*, *supra*. When determining whether there is substantial evidence, it is permissible to consider only the testimony that supports a finding of competency. *Id.* A.M. contends that when

16

incompetence is the presumption, the appellate court should only consider testimony supporting a finding of incompetency.

The State, on the other hand, proposes that when the standard of proof is a preponderance of the evidence, the circuit court's decision will not be reversed unless the court's findings are clearly erroneous or clearly against the preponderance of the evidence. *See Reeves v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 72, 595 S.W.3d 401 (dependency-neglect adjudication); *Jones v. State*, 355 Ark. 630, 144 S.W.3d 254 (2004) (probation revocation). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Herron v. State*, 2019 Ark. App. 367, 583 S.W.3d 408. The State also asserts that because the determination of a preponderance of the evidence turns on questions of credibility and weight to be given to the testimony, the appellate court defers to the circuit court's superior position. *Jones, supra.* Because there is a specified standard of proof below—preponderance of the evidence—we hold that a clearly-erroneous standard of review is appropriate.

A.M.'s first argument is that Dr. Silber was not qualified under the statute to conduct the fitness-to-proceed examination. He contends that Dr. Silber's inexperience is illustrated by the following facts: Dr. Silber had been a licensed forensic evaluator for "a little over two years"; it was not clear how many of Dr. Silber's previous juvenile evaluations had been under the supervision of the fellowship director as opposed to independently conducted; Dr. Silber had never been recognized as an expert in juvenile matters; and Dr. Silber consulted with an outside source, Dr. Kristin Addison-Brown, in forming his opinion and

writing his written report. A.M. asserts that he was entitled to be examined by an evaluator with more experience and who had "the requisite specific qualifications and training in evaluating juveniles."

While it is true that the statute requires an examiner who is "specifically qualified by training and experience in the evaluation of juveniles," the statute is silent as to what that qualification must entail, and there is no case law interpreting that section of the statute. The circuit court heard evidence that Dr. Silber is a licensed forensic psychologist, that he had performed 250 to 300 fitness-to-proceed examinations, that approximately 35 to 40 of those examinations had been of juveniles, and that he had advanced training in working with juvenile offenders as part of his forensic fellowship at Arkansas State Hospital. In light of this evidence, we hold that the circuit court did not clearly err in finding Dr. Silber to be a qualified expert within the meaning of the statute.

A.M.'s second argument is that even if Dr. Silber had been qualified, his opinion was insufficient to overcome A.M.'s presumed lack of fitness. A.M. highlights Dr. Silber's notation that some of the underlying data is equivocal and his opinion that the issue of A.M.'s fitness to proceed warranted "considerable reflection." Dr. Ewing, on the other hand, was unequivocal in his opinion that A.M. was not fit to proceed.

We view Dr. Silber's considerable reflection on this issue as a positive, not a negative, and Dr. Silber ultimately concluded that A.M. was fit to proceed. The circuit court heard the opinions of, and viewed the reports from, both doctors, and the court determined that "the information provided from [A.M.'s] general interview, statement to investigators, store video[,] and other information provided to [Dr. Silber] was sufficient to convince the Court

that the juvenile was fit to proceed." Further, the circuit court found Dr. Silber's diagnosis that A.M. did not suffer from schizophrenia more credible than Dr. Ewing's diagnosis of schizophrenia.

Following a circuit court's ruling on competency to stand trial, the appellate court will not attempt to weigh the evidence or pass on the credibility of witnesses when the medical reports conflict with each other. *Jones v. State*, 317 Ark. 131, 876 S.W.2d 262 (1994). With dueling medical experts, the trier of fact observes the witnesses firsthand, sees their demeanor and responsiveness in answering questions, and is in the best position to determine which is the more credible witness. *Mauppin v. State*, 314 Ark. 566, 865 S.W.2d 270 (1993). The fact-finder may believe all or part of any witness's testimony and is responsible for resolving questions of conflicting testimony and inconsistent evidence. *Satterfield v. State*, 2014 Ark. App. 633, 448 S.W.3d 211. Given this standard, we hold that the circuit court did not clearly err in finding A.M. fit to proceed.

Affirmed.

VIRDEN and GRUBER, JJ., agree.

*Robert M. "Robby" Golden*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.