Cite as 2026 Ark. 15

# SUPREME COURT OF ARKANSAS
**No.** CR-24-603

|  |  |  |
|---|---|---|
| | | **Opinion Delivered:** February 5, 2026 |
| AYDEN MERRELL | | |
| | APPELLANT | |
| | | APPEAL FROM THE MILLER |
| V. | | COUNTY CIRCUIT COURT |
| | | [NO. 46CR-24-295] |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE L. WREN AUTRY, |
| | | JUDGE |
| | | |
| | | AFFIRMED. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellant Ayden Merrell appeals the Miller County Circuit Court's order sentencing him as an adult and imposing a life sentence for his commission of capital murder and aggravated robbery when he was a juvenile. For reversal, Merrell argues that the circuit court erred by finding that the State proved that he was not amenable to treatment and that public safety required the imposition of an adult sentence. We affirm.

On February 2, 2017, then-twelve-year-old Merrell was arrested for the murder of Christa Shockley, a twenty-one-year-old clerk working at the E-Z Mart convenience store in Fouke, Arkansas. The State filed a delinquency petition in the juvenile division of circuit court on February 3 charging Merrell with capital murder and aggravated robbery. The petition alleged that Merrell had entered the convenience store, shot Shockley seven times with a pistol, exited the store and, after reentering, stole a vapor cigarette pack and

headphones. The State also filed a motion seeking to designate Merrell as an extended-juvenile-jurisdiction (EJJ) offender.[1]

At the August 30, 2018 hearing on the EJJ motion, surveillance video from the E-Z Mart was introduced. The video recording shows Merrell first entering the store at 12:56 a.m. on February 2, 2017. He was wearing a sweatshirt with the hood up, a bandana around his neck, and a backpack. He purchased a drink and then left, lurking around the side of the store near the dumpster and occasionally peering through the front windows. At 1:24 a.m., Merrell reenters the convenience store with his bandana pulled up over his nose. He browses for about ten minutes and then steals an electronic cigarette and an energy drink while Shockley is in the back of the store. After continuing to lurk outside the store, Merrell reenters at 1:58 a.m. and immediately begins shooting his pistol at Shockley. He fires seven shots as he advances at Shockley, fires one more after a brief pause, and then quickly exits the store. Shockley falls to her hands and knees, screams for help and for her mother, and eventually falls onto her back. After pacing outside and peering through the front windows, Merrell again enters the store at 2:02 a.m. He walks past Shockley's body several times as he goes behind the counter and briefly pauses to look at her. After stealing a pair of headphones and a vape cartridge, Merrell leaves the store and can be seen throwing items into the dumpster.

---

[1]The State may request an EJJ designation for a juvenile under the age of thirteen years at the time of the alleged offense who is charged with capital murder if the State has overcome the presumptions of lack of fitness to proceed and lack of capacity. Ark. Code Ann. § 9-27-501(a)(1) (Supp. 2025).

Sergeant Wesley Penny testified that he identified Merrell from the surveillance video. Penny explained that he had seen Merrell a couple of weeks before the murder, walking alone late at night wearing shorts and no shoes. Merrell claimed that he had been locked out of his house. Penny stated that, when he took Merrell home, the family denied that Merrell had been locked out, and they also showed him a cell-phone video where Merrell had recently slapped the phone out of his grandmother's hand when she was trying to record him.

The police detained Merrell at school on the morning of February 2 and interviewed him. Merrell confessed to the crimes. He initially claimed that Shockley looked like his mother's friend who had helped her physically abuse him; however, he later told Dr. Benjamin Silber, a psychological examiner, that he had made up that explanation and did not know why he shot the victim. Merrell told Penny that he took the pistol from his father's locked shed when he snuck out that night. When Penny asked why Merrell kept looking at his watch on the surveillance video, Merrell stated that he wanted to be back home by 3:00 a.m. because his father got up at 4:00 a.m. Penny stated that the police recovered the pistol, spare magazine, hoodie, and bandana in a wooded area behind the store.

Multiple witnesses testified regarding Merrell's history of violent and antisocial behavior. His father, Joey, stated that Merrell's issues began when he was two years old and that he became very defiant and resistant to change. Joey began seeking professional help for Merrell at the age of three. Joey stated that after gaining sole custody of Merrell when he was six due to physical abuse by his biological mother, Merrell's aggression increased.

3

For example, Merrell punched his stepmother in the jaw when he saw her with a coin that was his. Joey testified that Merrell also had major behavioral problems at school, and he placed him in a therapeutic day-treatment center for a period of time.

Merrell's second-grade teacher testified that Merrell punched, hit, and scratched other children and school personnel. He would also draw graphic pictures depicting himself as someone in the military shooting other people, and he told his teacher, "One day you're going to be scared of me." Merrell's school principal at that time testified that Merrell had a lot of problems interacting with peers, used extreme profanity, threatened teachers and students, and had an obsession with weapons and "Call of Duty." She stated that Merrell was the only student whose backpack she checked each day for a gun. One of Merrell's former therapists also testified that Merrell had arranged Legos that represented his mother surrounded by blood and that he had expressed a desire to kill her.

Dr. Silber also recognized that Merrell had a pattern of antisocial and violent behavior. He stated that Merrell's intellectual functioning was average but that his emotional and social skills were considerably below average. Dr. Silber diagnosed him with autism spectrum disorder and conduct disorder but opined that Merrell does have control of his actions and knows the difference between right and wrong. Dr. Silber further testified that Merrell scored highly when given a test to determine whether he was feigning, or exaggerating, mental-health symptoms. Dr. Silber disagreed with the diagnosis of Dr. Charles Ewing, a second forensic psychologist who examined Merrell at the request of the defense and who opined that Merrell was delusional and suffered from schizophrenia. Dr.

Ewing testified that Merrell told him that he was involved in gangs and a drug cartel and that he had committed multiple murders, robberies, and assaults.

The State presented evidence about Merrell's behavior subsequent to his arrest as well. Michael Kelly, who was employed at the Miller County Juvenile Center (JDC) where Merrell was being confined, testified that he had confiscated a comb from Merrell that he had fashioned into a shank. Merrell had also written disturbing phrases on the wall in his cell, such as "I let her die," "I see hell," "I see all evil things," and "Fear none, kill all." Kelly testified that Merrell had acted aggressively toward other juveniles and JDC personnel, such as punching another inmate "out of the blue." Carmen Hartfield, another JDC employee, described an incident in which Merrell had threatened staff and had to be physically restrained. Hartfield testified that Merrell told her while restrained that "he would kill us, me myself, and he said he would stand over me as I take my last breath." As the staff was releasing him from the restraints, Merrell turned around and hit Hartfield in the face. She testified to yet another incident where Merrell cursed at her, had to be physically restrained, and again stated that he would kill them and watch them die. Rhonda Magee, who was also employed at the JDC, described an incident where Merrell was disciplined for putting feces on the toilet and then told the staff that "he was going to put two shots in [their heads] and eight in [their] chests just like he had done before." Other JDC staff testified to additional incidents where Merrell cursed, physically assaulted, and/or threatened other juveniles and staff.

Following the hearing, the circuit court entered an order on October 9, 2018, granting the State's motion to designate Merrell as an EJJ offender. Merrell's appeal of the

5

EJJ designation was affirmed. *A.M. v. State*, 2019 Ark. App. 357, 584 S.W.3d 253 (*Merrell I*). After the circuit court determined that Merrell was fit to proceed, a jury trial on the delinquency petition was held on July 6–8, 2020.[2] The jury rejected Merrell's affirmative defense of not guilty by reason of mental disease or defect and found that he had committed capital murder and aggravated robbery and used a firearm during the commission of these offenses. The circuit court entered an order on July 17 adjudicating Merrell delinquent and committing him to the Arkansas Division of Youth Services (DYS) as an EJJ offender until such time as DYS petitioned for his release. The circuit court stated that imposition of an adult sentence was suspended pending future review.[3] Merrell appealed the circuit court's rulings finding him fit to proceed and adjudicating him delinquent, and the court of appeals affirmed. *A.M. v. State*, 2021 Ark. App. 418.

Merrell was transferred to the Alexander facility of DYS where he received rehabilitative services through the Rite of Passage (ROP) program for several years. On June 16, 2022, DYS filed a petition to release Merrell that it then withdrew on August 30, stating that the petition had been filed prematurely. A second petition to release, which was filed on December 22, was also withdrawn by DYS several weeks later. On October 4, 2023, DYS filed a petition to impose an adult sentence on Merrell, stating that he was not amenable to rehabilitation and that imposition of an adult sentence was necessary based on

---

[2]An EJJ offender and the State have a right to a jury trial at the adjudication hearing. Ark. Code Ann. § 9-27-505(a) (Supp. 2025).

[3]If a juvenile is found delinquent as an EJJ offender, the circuit court shall either order any of the juvenile dispositions authorized by Ark. Code Ann. § 9-35-423 or suspend the imposition of an adult sentence pending court review. Ark. Code Ann. § 9-27-506 (Supp. 2025).

the nature of the offenses, the risk to public safety, the length of time he had been in DYS custody, the incidents while he was in custody, and the opinion of rehabilitative staff. On January 30, 2024, this petition was also withdrawn by DYS because of Merrell's progress in reaching his treatment goals and the fact that he had not been the aggressor of an incident since March 2023.

Merrell filed a petition for review and modification of his disposition on February 27, 2024, requesting that he be released from DYS custody. DYS filed another petition for release on March 12 claiming that Merrell had been rehabilitated and should be discharged to a supervised aftercare program. On March 20, the State filed a petition to impose an adult sentence on Merrell, who had just turned twenty years old.

The circuit court held a hearing on the competing petitions on May 7, 8, and 10, 2024. The parties stipulated that the circuit court could take judicial notice of all prior proceedings, transcripts, pleadings, and exhibits in the case. DYS presented the testimony of seven witnesses from the Alexander facility. Dr. Sean Jones testified that he had been Merrell's therapist since August 2023 and met with him for thirty minutes to an hour each week. Dr. Jones stated that Merrell had made great progress, that he had completed all of his treatment goals, and that there was nothing left for him to accomplish. Dr. Jones admitted that Merrell had been involved in an altercation about a week prior to the hearing, but it was his understanding that another student had approached Merrell and challenged him. He believed that Merrell was capable of restraining himself if released into the community and stated that Merrell "is not the type to run up on individuals and instigate or initiate aggression or violence." Dr. Jones testified that Merrell was not manipulative with him but

7

agreed that a former therapist or treatment team member had described Merrell as manipulative in the past. According to Dr. Jones, Merrell was ready to be released and was not a danger to himself or others.

On cross-examination, Dr. Jones agreed that DYS had filed a petition to impose an adult sentence in October 2023 but stated that it was withdrawn in January 2024 because the treatment team and Merrell's counsel disagreed with it. Dr. Jones admitted that Merrell had completed the majority of his behavioral health goals in January 2024. Dr. Jones also acknowledged that his description of the recent incident involving Merrell and another student differed from the written staff report of the incident but claimed that the report was incorrect. Dr. Jones testified that Merrell was interested in a career in the military focusing on cyber security. When asked whether he had any concerns about Merrell carrying a firearm, Dr. Jones stated that he did not, although he stated that he did not have a crystal ball and could not answer the question whether that would be a risk to public safety. On redirect, Dr. Jones testified that he had never concluded that a juvenile under his care was not amenable to rehabilitation. The State later re-called Dr. Jones, who admitted that his license had recently been suspended for two years as the result of a complaint by what he described as a disgruntled co-worker.

Jennifer Johnson, Merrell's case manager at ROP since August 2023, testified that she met with Merrell weekly but also saw him throughout the day around the campus. With regard to the incident in April 2024, Johnson testified that it was also her understanding that another student had approached Merrell and initiated the conflict. Johnson stated that she had no concerns about releasing Merrell and that she did not believe he posed an imminent

threat to public safety. Johnson agreed on cross-examination that simply because Merrell had exhausted all of the opportunities available to him at DYS did not necessarily mean that he was rehabilitated.

Kimberly Bell, the assistant director for DYS, testified that Merrell was one of her students when she was the clinical director at ROP a couple of years earlier. She stated that he was guarded with her but that he had matured and made progress since then. Bell explained that DYS had filed the earlier petition to impose an adult sentence because Merrell was not doing well at that time and that there were concerns with his aggression and lack of remorse. She testified that her only concern with him being released would be if he did not actively continue in treatment. She also stated that he would need stringent supervision. During cross-examination of Bell, the State played the video recording of the murder. Bell testified that after watching it, she could not say that Merrell did not understand the gravity of his crimes. When asked whether she was concerned about him reoffending in the same manner, Bell testified that she could not say what he might do if released. According to Bell, Merrell had told her that he committed the murder because he was on an assignment from his uncles, who were part of the Russian mafia. When she asked Merrell what regrets that he had about that night, he responded that he regretted staying at the scene of the crime for too long. Bell further stated that Merrell had made other statements that concerned her, such as saying that gay people were "less than human." She was also concerned about his desire for a career in either the United States military or Russian Special Forces, about his recent altercation in April, and about the fact that he had only started participating in certain programs after discussions began about his potential release. Bell agreed that other staff had

reported Merrell's manipulative behavior and that he had also attempted to manipulate her. She stated that Merrell "was very big on receiving respect in order to give respect."

Candra Dobson, the case coordinator supervisor, testified that she had known Merrell since he entered the facility. She met with him each month but also saw him on the campus almost daily. She stated that he was not the same person as he was in 2020 and that he had matured and made great progress. Dobson testified that an aftercare plan had been prepared, that Merrell would be living with his father in Texarkana, Texas, and that Texas would be abiding by the plan. She indicated that she had no concerns about the aftercare plan. When asked on cross-examination about the recent incident with Merrell, Dobson stated that she did not witness it but was told by staff that Merrell was defending himself. She disagreed that he had displayed violent behavior during the incident. Dobson did not believe Merrell was a risk to public safety because he had completed the treatment goals and had not been a threat to himself or others in a long time.

Charles Parkins, the program director for ROP at the facility, testified that he had worked more closely with Merrell since July or August 2023, when Merrell was involved with the World of Works program where the juveniles who had earned their GEDs or high school diplomas would learn employment skills and about different trades. Parkins stated that Merrell had helped him set up and maintain a saltwater fish tank and had earned the privilege of an outing to a pet store. Merrell also worked with maintenance and in the kitchen. Parkins testified that Merrell had "come a long way" in treatment and that he was no more of a threat to public safety than any other person. On cross-examination, the State introduced a video of the April 27, 2024 incident. Parkins agreed that the video shows

Merrell twice approaching another student who was sitting on the couch listening to music. The first time, Merrell placed his hands on the student's shoulders and then sat back down in a chair in the corner. When he approached the second time, Merrell placed the other student in a headlock. The staff then intervened and separated them. Parkins also testified to another incident in February 2023 where Merrell was accessing a Discord server on his computer rather than working on his college courses. Parkins stated that Merrell's email activity showed multiple videos downloaded from that site depicting graphic violence and nudity.

Charles Todd, a case manager at ROP, testified that Merrell was "standoffish" when he first came to the facility and that he was sometimes bullied by other peers. Todd stated that he developed a good rapport with Merrell, at least partly due to Todd's military background and Merrell's interest in the military. Todd testified that Merrell had shown tremendous growth and that he did not believe Merrell posed a substantial risk to public safety. On cross-examination, Todd indicated that he was familiar with Merrell's belief that he was a Russian operative and stated that he had told Merrell to stop discussing that, particularly if he wanted to join the United States military. Todd agreed that some staff were fearful of Merrell because he can be intimidating.

The final DYS witness was Tyler Cox, the dean of students at ROP. Cox stated that he was in charge of the status program where the students progress through three stages— Rookie, Intern, and Ram—according to behavior-management skills. He testified that Merrell began showing interest in the program a year earlier and that he earned Intern status in October 2023 and Ram status in March 2024. Cox also referenced several awards and

certificates that Merrell had earned for positive behavior and stated that he did not believe Merrell posed any threat to public safety. On cross-examination, Cox agreed that all of the awards he had mentioned had been earned from October 2023 onward. He also admitted that Merrell had at least twenty-two incident reports in his file, although Merrell was not necessarily the aggressor in all of them. Cox expressed concern over the April 2024 altercation and the fact that Merrell did not use the behavioral skills he had learned during that event. When asked what assurance he could give the court that Merrell would utilize those skills if released from DYS, Cox stated, "I can't testify to that. It would be up to him personally."

Merrell called four additional witnesses to testify on his behalf. Elvira Pecina, a former counselor and instructor at ROP, stated that Merrell earned his GED early on and continued to learn life skills through working in the kitchen and for maintenance. She testified that she had seen a lot of growth and positivity from Merrell since late 2022, when she began interacting with him on a daily basis. Lavaris Edwards, the director of group living at the facility, also testified that Merrell had grown during the past two years and that he was now self-motivated to participate in the program. Brooke Digby, juvenile ombudsman for the Arkansas Public Defender Commission, testified that she is an advocate for the youth in DYS. She stated that she had interacted with Merrell frequently over the past four years and that she had seen significant progress, including witnessing him walk away from a conflict.

Finally, Merrell's father, Joey, testified regarding the aftercare plan. He stated that he planned to get an apartment where he and Merrell would stay so that Merrell could slowly reintegrate into the family and society. Joey indicated that other family members would be

able to help supervise and support Merrell while Joey was working. He stated that he would either arrange employment for Merrell with a friend or enroll him in school. Joey further testified that he would ensure Merrell complied with any restrictions placed on his release and that he continued to participate in therapy. In response to questioning by the circuit court, Joey explained that Merrell would not be living in the same house as his stepmother and half siblings at first because there was not enough room and because his stepmother wanted him to reintegrate first.

The State called the victim's sister, Tonya Shockley, and her mother, Eugenia Shockley, to provide victim–impact testimony. Tonya stated that she was close in age to her sister and that they did everything together. She testified that she was pregnant when Christa was murdered and that Christa was very excited about being an aunt. Because Christa could not be the maid of honor at her wedding, Tonya placed Christa's picture on the table in her honor. Tonya explained that she will never be able to fill the hole that was left inside her as a result of Christa's murder. Eugenia testified that Christa "loved everything" and that she had lots of plans. Christa was working two jobs while also taking classes, and she was the photographer in the family. Eugenia testified that her daughter's death has affected their entire family. She read letters from Christa's two younger sisters expressing their pain at the loss of their sister.

At the conclusion of the hearing, the circuit court considered each of the required statutory factors and made extensive findings based on its review of the entire record. The court then concluded that Merrell was not amenable to treatment and that public safety required imposition of an adult sentence. The circuit court sentenced Merrell to life

13

imprisonment for the capital murder with the possibility of parole after thirty years[4] and to ten years' imprisonment for the aggravated robbery, with the sentences to run concurrently. A written order granting the State's motion to sentence Merrell as an adult was entered on May 13, 2024, and the sentencing order was entered on May 16. Merrell timely appealed.

On appeal, Merrell argues that the circuit court erred by finding that the State proved that he was not amenable to treatment and that public safety required the imposition of an adult sentence of life imprisonment. He claims that the circuit court ignored the overwhelming testimony about his rehabilitative progress and the treatment team members' support for his release and instead focused on the egregious nature of the offense. Merrell contends that this was improper and that we should reverse.

Once a juvenile has been designated an EJJ offender, either the juvenile or DYS may petition the circuit court to review and modify the disposition at any time. Ark. Code Ann. § 9-27-507(c)(1)(A), (2)(A) (Supp. 2025). The State may also petition the circuit court at any time to impose an adult sentence if the juvenile has violated a juvenile disposition order; has been adjudicated delinquent or found guilty of committing a new offense; or is not amenable to rehabilitation in the juvenile system. Ark. Code Ann. § 9-27-507(a). If no hearing has been conducted six months before the juvenile's eighteenth birthday, the circuit court shall conduct a hearing to determine whether to release the juvenile, amend or add

---

[4]Arkansas Code Annotated section 5-4-104(b) (Supp. 2025) provides that a defendant who was under the age of eighteen at the time he or she committed the offense of capital murder shall be sentenced to life imprisonment with the possibility of parole after serving a minimum of thirty years' imprisonment.

any juvenile disposition, or impose an adult sentence. Ark. Code Ann. § 9–27–507(e)(1). In making its determination, the court shall consider the following:

(A) The experience and character of the juvenile before and after the juvenile disposition, including compliance with the court's orders;

(B) The nature of the offense or offenses and the manner in which the offense or offenses were committed;

(C) The recommendations of the professionals who have worked with the juvenile;

(D) The protection of public safety;

(E) Opportunities provided to the juvenile for rehabilitation and the juvenile's efforts toward rehabilitation; and

(F) Victim impact evidence admitted pursuant to § 16–97–103.

Ark. Code Ann. § 9–27–507(e)(2). If the State seeks to impose an adult sentence, the State must prove by a preponderance of the evidence that the imposition of an adult sentence is appropriate and that public safety requires imposition. Ark. Code Ann. § 9–27–507(e)(3).

Following the hearing, the court may release the juvenile, amend or add any juvenile disposition, or exercise its discretion to impose the full range of adult sentencing available in the criminal division of circuit court, including probation, suspended imposition of sentence, and imprisonment. Ark. Code Ann. § 9-27-507(e)(4)(A). Juveniles adjudicated delinquent for capital murder may be sentenced to any term of imprisonment, up to and including life. *Id*. A circuit court may not order an absolute release of an EJJ offender who had been adjudicated delinquent for capital murder; if release is ordered, the court shall impose a period of probation of not less than three years. Ark. Code Ann. § 9-27-507(e)(4)(D). A juvenile committed to DYS under EJJ shall not remain in the physical

custody of the division beyond his or her twenty-first birthday, even if the court fails to provide a hearing before the release. Ark. Code Ann. § 9-27-507(e)(5)(A).

Because this is the first appeal from the imposition of an adult sentence on an EJJ offender that this court is addressing on the merits, we must first determine the proper standard of review to apply to the circuit court's ruling. *See State v. K.H.*, 2010 Ark. 172, 368 S.W.3d 46 (dismissing a prior appeal by the State from the denial of a motion to impose an adult sentence based on a lack of jurisdiction). As required by section 9-27-507(e), the State had to prove by a preponderance of the evidence that imposition of an adult sentence on Merrell was appropriate and that public safety required it. In other appeals involving the preponderance-of-the-evidence burden of proof, such as an appeal from the revocation of probation or a suspended sentence, we have applied the clearly-erroneous standard of review. *See, e.g.*, *Crouse v. State*, 2012 Ark. 442 (appeal from revocation of probation). In *K.H.*, *supra*, we explained that an appeal from an order denying a petition to impose an adult sentence is akin to an appeal from a revocation proceeding. Appeals from an EJJ designation are also reviewed under the clear-error standard. *E.g.*, *Merrell I*, *supra*. We hold that the same standard is appropriate here. *See also Barton v. State*, 2011 Ark. App. 117 (reviewing circuit court's order imposing adult sentence for clear error). Accordingly, we will not reverse the circuit court's order imposing an adult sentence on Merrell unless it is clearly against the preponderance of the evidence. Also, because the determination of a preponderance of the evidence turns on questions of credibility and weight to be given to the testimony, we defer to the circuit court's superior position in that regard. *Crouse*, *supra*.

As noted above, the circuit court in this case thoroughly discussed each of the six factors required by section 9-27-507(e)(2) in its oral ruling. With regard to the first factor—the experience and character of the juvenile before and after the juvenile disposition, including compliance with the court's orders—the circuit court stated that while Merrell did not have any prior juvenile adjudications, he did exhibit a pattern of antisocial behavior from an early age despite intensive efforts by his family and schools to provide him treatment. The court specifically noted the testimony that Merrell's principal felt it necessary to check Merrell's backpack each day for a gun and that Merrell had slapped a cell phone out of his grandmother's hands. The court noted that after Merrell was detained, he continued with his disruptive behavior from 2017 to 2020 by threatening and assaulting staff and juveniles, making a shank out of a comb, acting in a manipulative manner, and glorifying extreme violence. The circuit court stated that from 2020 to the present, Merrell's progress was mixed, as he would show improvement and then regress. The court noted that he was involved in a total of twenty-four incidents, which was "too many." The circuit court recognized that Merrell had made progress in recent months but characterized it as an "eleventh-hour conversion" after the October 2023 petition to impose an adult sentence was filed.

As to the nature of the offenses and the manner in which the offenses were committed, the circuit court stated that capital murder and aggravated robbery are Class Y felonies, which are the most serious felonies in Arkansas. The court emphasized that Merrell acted alone to murder a stranger, that there was no peer influence or participation, and that the crime was premeditated rather than impulsive. The court described the commission of

17

the crime and noted that the surveillance video showed Merrell casing the convenience store, firing a final shot at the victim while she was writhing in agony, and then calmly walking past the victim and pausing to stare at her as he stole items from the store. The circuit court stated that the murder was "the most callous, coldblooded heinous act" that it had ever seen.

Next, the circuit court discussed the third factor, which is the recommendation of the professionals who have worked with the juvenile:

> The recommendations of the professionals who have worked with him. I'm going to consider these, but I certainly take issue with them, and I'll go into some detail about that. Dr. Jones was a contractor with DYS. He recommended release into the community. He doesn't believe that he poses a risk to society. He has no problems with Mr. Merrell joining the military or purchasing a gun. And I'll come back to that in a minute. Still, one of the things that was never adequately explained in this case was why DYS filed a motion to impose an adult sentence in October of 2023 and then didn't withdraw it until January 30, 2024. That's only three months ago. That's obvious to me that the Department, even their own experts, are conflicted about this case. The withdrawal of the petition was greatly dependent upon the recommendations of his last therapist, Dr. Jones. The first thing that Dr. Jones said was that he treated Mr. Merrell about a year, I believe he said, but it turns out it was only nine months. The second day of the hearing his credibility took a big -- it was impacted by the news that his license was suspended, currently for two years, suspension based on a complaint of misfeasance which led to probation, probation failure, and then the two year suspension. This was not disclosed to the Court voluntarily.

> Some other problems I had with Dr. Jones' testimony --. Well, of course, I'm going to get into what Ms. Bell said. There's a stark contrast there. But the February 3, 2023 incident about the college classes, Dr. Jones said that Ayden Merrell was accessing YouTube videos just to listen to music while studying, but Mr. Parkins said that no, it was a Discord server where students could access graphic violence and nudity. Now I don't know that Dr. Jones was trying to mislead the Court, but what it does show me is that at the very least he didn't do his due diligence and he didn't investigate that. So that's concerning. The April 27, 2024 video, again Dr. Jones said that it was his understanding that someone ran up on Mr. Merrell and that Mr. Merrell just reacted. That's absolutely not the case. The video speaks to that. Again, I

18

don't know that Dr. Jones -- he gave a very studied response and I'm a little suspicious of it, but regardless of that, again it just demonstrates the lack of due diligence on his part. In that video, it was very clear that Mr. Merrell was the aggressor, not once but twice, and I think that's sort of a stress test.

These recommendations from the folks, I know that you're asked to give, but there's sort of a built-in bias. A bias is not necessarily something evil. It's just that there's a bias. There just is. And it's because you've put in the work. It's sort of like grading your own papers. You're grading your own papers, really. You've put in the work. You worked with this individual. This is your project, and then you're asked to evaluate him. And if they're not making progress, that reflects on you. I understand that. I'm not saying it's false necessarily, but there is a bias.

The court went on to note its concern that Dr. Jones had not watched the video of the murder, which again related to his lack of due diligence. The circuit court next addressed Bell's testimony, stating that while it respected her opinion, she was also unfamiliar with the details of the crimes. The court noticed how Bell's countenance and testimony changed after watching the surveillance video. The circuit court found it difficult to believe that Merrell's lack of remorse, as testified to by Bell, changed that drastically between when she ended her treatment of him in 2022 to August 2023, when Dr. Jones became his therapist. The court further noted Bell's concerns about statements that Merrell had made about gay people and his obsession with the military.

The fourth factor that the circuit court considered is the protection of public safety. The court again referenced the surveillance video, noting the heinous, deliberate, and premeditated nature of the crimes and Merrell's calmness afterward, which the court described as chilling. While the circuit court stated that it was taking into account Merrell's youth at the time of the murder, it also found that Merrell appeared to have no remorse until he was nineteen years old. The court expressed its concern that Merrell was simply

19

"parroting what we want to hear." With regard to Merrell's mental health, the court stated that the diagnosis of autism implies impulse control; however, the crimes that he committed were planned and not impulsive or a result of peer pressure.

The circuit court next addressed the fifth factor, which is the opportunities provided to the juvenile for rehabilitation and the juvenile's efforts toward rehabilitation. The court recognized the massive efforts made by Merrell's family, grade schools, and therapists to address his behavioral problems when he was young, none of which seemed to help. The court found that DYS had also provided rehabilitative services for many years, but it was only after the petition to invoke an adult sentence was filed that Merrell began to make significant progress. The court noted its concern that this recent progress was simply Merrell's "survival instinct kick[ing] in" and learning as he matured that his efforts affect his legal status.

Finally, the circuit court discussed the sixth factor, which is the victim–impact evidence. The court stated that there was "permanent damage to the family[,]" and "a hole inside that's never filled." The court found that Merrell "took the most possible from them. And she was an outstanding young woman, outstanding."

After considering the entire record and discussing the evidence pertinent to each of the required factors, the circuit court concluded that an adult sentence was appropriate and that public safety required it. The court also found that Merrell was not amenable to treatment, specifically referencing Bell's testimony, all of the witnesses who stated that there were no further services to offer Merrell at DYS, and the evidence demonstrating that Merrell did not pass recent "stress tests."

In arguing that the State failed to show by a preponderance of the evidence that an adult sentence was appropriate or that public safety required it, Merrell points to the opinion of all his treatment team members that he was rehabilitated and not a danger to the community and to the discharge summary showing that he had completed all of his treatment goals. He asserts that the State presented no testimony by any witnesses who disagreed with the assessment of his treatment team. Merrell contends that the circuit court "dismissively" determined that each member of the treatment team was biased in his favor, rejected their professional opinions, and decided that given the egregious nature of the underlying crime, he would serve the rest of his life in prison. He argues that the circuit court's credibility determinations are not beyond appellate review and that the court here failed to properly review and consider the evidence, focusing on one factor above all others.

We cannot say that the circuit court's ruling was clearly against the preponderance of the evidence. Contrary to Merrell's assertion, the court did not ignore the recommendations of his treatment team or dismissively determine that their opinions suffered from an inherent bias. The circuit court specifically noted the credibility issues with regard to Dr. Jones's testimony, such as his mischaracterization of at least two incidents involving Merrell and his lack of due diligence in learning the details of Merrell's crimes. Dr. Jones was not the only DYS witness to downplay Merrell's role in the April 2024 altercation, in which the video clearly showed that Merrell was the aggressor. Furthermore, even crediting the treatment team's testimony regarding Merrell's progress, the vast majority of his behavioral goals were met less than six months before the hearing. The circuit court found that this "eleventh hour" progress was likely a result of the filing of the petition to

21

impose an adult sentence in October 2023 and not true progress. As stated earlier, we defer to the circuit court's superior position to resolve questions of credibility. *Crouse*, *supra*.

Nor did the circuit court err by placing great weight on the heinous nature of the crimes in reaching its decision. As we have held in appeals from juvenile-transfer proceedings, there is no requirement that the circuit court give equal weight to each statutory factor. *See, e.g.*, *Otis v. State*, 355 Ark. 590, 142 S.W.3d 615 (2004). The circuit court here correctly recognized that Merrell did not act impulsively or as a result of peer pressure but instead committed the crimes in a premeditated, deliberate, and callous manner. He planned the crime by sneaking out while his family was asleep, stole a pistol and an extra cartridge from his father's locked shed, attempted to mask his identity by wearing a hood and a bandana over his face, cased the convenience store to ensure that no other customers were present, and kept track of the time so that he could return home before his father awoke. He fired eight shots at the victim, with the final shot being fired as he approached the victim, who was screaming for help. Merrell then calmly chose which items to steal, paused briefly to stare at the victim's body as he passed by her several times, discarded evidence on his way home, and went to school the next morning as usual. As the court of appeals held in *Barton*, *supra*, in another appeal from the imposition of an adult sentence, "a person participating in a crime as shockingly cruel and senseless as this must be very successful indeed in his rehabilitation efforts before it can be said that he has been rehabilitated to the extent that the public will not be endangered by his release." *Id*. at 3. The circuit court noted the multiple incidents that Merrell was involved in during his four years at DYS and was particularly concerned about the April 2024 incident, which occurred

only two weeks before the hearing and after Merrell had reportedly achieved his behavioral goals. The court stated that this incident was a "stress test" that showed the court what could happen if Merrell was disrespected out in public one day.

In addition to the disturbing nature of the crimes in this case, we agree with the circuit court that the remaining factors in section 9-27-503(e)(2) also weigh in favor of the imposition of an adult sentence. Merrell has a lengthy history of antisocial and violent behavior, both before and after his arrest, and as the April 2024 incident shows, he remains a danger to public safety. Despite a multitude of opportunities for rehabilitation, Merrell did not truly engage in them until less than one year before the hearing, *after* a petition to impose an adult sentence was filed and he was informed of the possibility of release. The victim's family also testified to the lifelong impact of Christa's death. Based on all of the evidence in the record, the circuit court did not clearly err by finding that Merrell was not amenable to rehabilitation, that imposition of an adult sentence was appropriate, and that public safety required it. We therefore affirm.

Affirmed.

*Robert M. "Robby" Golden*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Christian Harris*, Sr. Ass't Att'y Gen., for appellee.